1  John J. Harris (SBN 93841)
2  jharris@cassosparks.com
   Jamie M. Cheng (SBN 298750)
3  jcheng@cassosparks.com
4  **CASSO & SPARKS, LLP**
   13300 Crossroads Pkwy. North, Suite 410
5  City of Industry, CA  91746
   Phone:  626.269.2980
6
7  Scott S. Balber (*pro hac vice* pending)
8  scott.balber@hsf.com
   Benjamin Rubinstein (*pro hac vice* pending)
9  benjamin.rubinstein@hsf.com
10 **HERBERT SMITH FREEHILLS NEW YORK LLP**
   450 Lexington Avenue, 14th Floor
11 New York, NY 10017
   Phone:  917.542.7600
12
13 Attorneys for Plaintiff
14 NASCO PETROLEUM, L.L.C.

15              **UNITED STATES DISTRICT COURT**

16         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

17                   **WESTERN DIVISION**

18 | NASCO PETROLEUM, L.L.C., | CASE NO.: 2:23-cv-884 |
|---|---|
19 |  |  |
|         Plaintiff, | **COMPLAINT FOR (1) INVERSE** |
20 |        v. | **CONDEMNATION –** |
21 |  | **UNCONSTITUTIONAL TAKING** |
| CITY OF LOS ANGELES, ESTINEH | **OF PROPERTY (42 U.S.C. § 1983);** |
22 | MAILIAN in her capacity as Chief | **(2) INVERSE CONDEMNATION -** |
| Zoning Administrator for the City of | **UNCONSTITUTIONAL** |
23 | Los Angeles, VINCENT BERTONI in | **EXACTION/CONDITION (42** |
24 | his official capacity as Director of the | **U.S.C. § 1983);** |
| Los Angeles Department of City | **(3) VIOLATION OF** |
25 | Planning, and DOES 1 THROUGH 50, | **PROCEDURAL DUE PROCESS –** |
26 |  | **AS APPLIED (42 U.S.C. § 1983);** |
|          Defendants. | **(4) VIOLATION OF** |
27 |  | **SUBSTANTIVE DUE PROCESS –** |
28 |  | **AS APPLIED (42 U.S.C. § 1983);** |

1   **(5) VIOLATION OF EQUAL**
2   **PROTECTION – AS APPLIED (42**
    **U.S.C. § 1983); (6) VIOLATION OF**
3   **THE FIRST AMENDMENT (42**
    **U.S.C. § 1983); AND**
4   **(7)  DECLARATORY JUDGMENT**
5   **AND FOR MANDATE AND**
    **INJUNCTIVE RELIEF**
6
7   **DEMAND FOR JURY TRIAL**

8

9       Plaintiff, Nasco Petroleum, L.L.C., a Delaware limited liability company

10  ("Nasco") alleges the following Complaint against the above-named Defendants

11  based on their illegal and unconstitutional infringements upon and taking of Nasco's

12  property rights in oil and gas leases owned and operated by Nasco in the City of Los

13  Angeles, as follows:

14                          **INTRODUCTION**

15      1.      Since the late 1800s, when oil was first discovered in the Los Angeles

16  Oil Field, the City of Los Angeles ("City") encouraged oil and gas operators to

17  engage in the exploration and production of oil and gas within the City to meet its

18  residents and California's energy needs and to promote the city and state economy.

19  Nasco—a local, minority-owned oil and gas company who operates injection wells

20  in Los Angeles to provide that essential product—made significant investments in

21  the development of energy in California over the last several years.

22      2.      California's oil and gas industry is the most heavily regulated business

23  in the State of California and likely, the entire United States. For example, all of

24  Nasco's surface and subsurface oil and gas production operations are regulated and

25  closely supervised by the California Geologic Energy Management Division

26  ("CalGEM"). All of Nasco's equipment that could potentially emit airborne

27  contaminants is permitted and monitored on a regular basis by the South Coast Air

28  Quality Management District. Other state agencies are directly involved in the

supervision and regulation of Nasco's oil production operations.

3.     In recent years, however, there have been demands from vocal groups in Los Angeles and California to put an end to fossil fuel production and extraction in the state based on unfounded or exaggerated concerns, without proper regard for the well-established property rights of mineral owners, royalty owners, and oil operators, like Nasco, which made substantial financial investments on the reasonable expectation that the City would adhere to substantive and procedural legal protections on their property rights. Regrettably, this has not been the case. Rather, many local and state politicians have seized on these demands to try to drive the oil and gas industry out of Los Angeles as an opportunity to curry favor with constituents by blatantly running roughshod on an industry that supports nearly every aspect of California's economy. Indeed, the City of Los Angeles has just enacted an ordinance that, if implemented, would phase out all oil and gas drilling within the city limits.

4.     As part of their effort to virtue signal to voters, local politicians in the City have decided to single out Nasco as a target of particularly overzealous and legally unsupportable enforcement of city and state regulations—blatant abuses of government powers—resulting in deprivations of Nasco's vested property and due process rights. Presumably, Nasco makes an easy political target because it is perceived as a small operator without the financial wherewithal to fight back to vindicate its rights.

5.     By the conduct alleged herein, the Defendants, individually and collectively, have sought to saddle Nasco's production with arbitrary and unwarranted costs, deprived Nasco of notice and an opportunity to contest these unjustified demands, subjected Nasco to an aggressive pattern of selective enforcement tactics, and have tried to penalize Nasco, while denying any opportunity for fair administrative process, all designed to score political points, while limiting the Defendants' perceived downside risks.

6.     Through these actions, the Defendants crossed the line from proper government regulation within the bounds of the law to constitutionally impermissible selective enforcement and discrimination—with the net effect being that the Defendants' conduct has resulted in (1) an uncompensated taking of Nasco's property without just compensation, (2) the denial of Nasco's constitutional due process and equal protection rights, (3) the infringement on Nasco's free speech, and (4) multiple other violations of state and federal law, as set forth herein.

7.     Nasco brings this action to remedy the injuries occasioned by these unjustified and improper acts of the Defendants, including damages to be proven at trial, attorneys' fees, costs, expenses, and declaratory and injunctive relief. Absent court intervention, Nasco will continue to be harmed in the conduct of its lawful business through the imposition of arbitrary civil penalties, the threat of losing zoning approval to continue its oil and gas operations, the deprivation of its property rights without just compensation, and the costs to redress the Defendants' conduct.

## THE PARTIES

8.     Nasco is a limited liability company, organized under the laws of the State of Delaware and is authorized to do business and is validly doing business in the State of California. Nasco's principal place of business is located in the City of Los Angeles, in the County of Los Angeles, California.

9.     Defendant, City of Los Angeles ("City") is a charter city, organized and existing under the laws of the State of California.

10.     Defendant, Estineh Mailian ("Mailian") is the Chief Zoning Administrator in the City of Los Angeles Department of City Planning. Nasco sues Mailian in her official capacity.

11.     Defendant, Vincent Bertoni ("Bertoni") is the Director of the City of Los Angeles Department of City Planning. Nasco sues Bertoni in his official capacity.

12.     Nasco does not know the true names and capacities of the Defendants sued herein as Does 1 through 50, inclusive, and therefore sues them by their fictitious names. Nasco will amend this Complaint to insert the true names of the fictitiously-named defendants when ascertained.

13.     Nasco alleges that the defendants are jointly, severally, and/or concurrently liable and responsible for the injuries set forth herein, each acting on their own or as the agents of the other defendants.

## JURISDICTION AND VENUE

14.     This action arises under the laws of the United States and the State of California, and this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. Nasco's constitutional claims give rise to federal questions properly before this Court. This Court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

15.     The Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and mandate relief

16.     Venue is proper in this District under 28 U.S.C. § 1391 because the claims arose within the Central District of California, the Defendants are located in this District, and the property at issue is located in this District.

17.     Nasco has performed all conditions precedent to filing this action and has exhausted all administrative remedies to the extent required by law or that it would be futile to exhaust administrative remedies, as further alleged below.

18.     Nasco has no plain, speedy, or adequate remedy in the court of ordinary law because Nasco will be irreparably harmed by the ensuing damage caused by implementation of the threatened actions of the Defendants in violation of law and Nasco's constitutional rights.

///

# FACTUAL BACKGROUND

**I.      Rights and Interests in the Downtown Los Angeles Drill Site Currently Operated by Nasco Have Existed for More Than Fifty Years.**

19.     Nasco is a small, minority-owned company in the business of oil and gas exploration, development, and production operating in Los Angeles. Nasco is the owner and "operator" (as defined in California Public Resources Code section 3009) of oil and gas production wells and water injection and disposal wells ("Wells") located on the 0.9 acre drill site known as the "Downtown Los Angeles Drill Site" ("Site"), located at 1325 S. Broadway in the City of Los Angeles in the Los Angeles Downtown Oil Field. Nasco has made significant investments in support of the continued production of oil, gas, and other hydrocarbons in the area.

20.     The Site is located in Urbanized Oil Drilling District U-97 established in 1963 by the City's Ordinance No. 124,316 and Well. A true and correct copy of the City's Ordinance No. 124,316 is attached hereto as **Exhibit A**.

21.     Under California law, a landowner or mineral owner has an unqualified and absolute right to produce oil and gas from formations beneath its property. This is a right which is "as much entitled to protection as the property itself, and an undue restriction on the use thereof is as much a taking 'or constitutional purposes as appropriating or destroying it.'" *People v. Assoc. Oil Co.*, 211 Cal. 93, 99-100 (1930); *Sindell v. Smutz*, 100 Cal. App. 2d 10, 17 (Cal. Ct. App. 1950). Oil production is a business which must operate, if at all, where the resources are found. To balance the property rights of landowners with the City's zoning objectives, the City of Los Angeles established drilling districts throughout the City by numerous ordinances pursuant to a general scheme and program of zoning and for the purpose of limiting oil and gas production operations to designated sites at which centralized oil and gas production operations would be conducted, rather than to have oil wells and related facilities spread out through multiple lots overlying an oil field. In this manner, property owners are provide with a means to have oil and gas resources

beneath their properties produced from centralized facilities in which oil and gas wells are directionally drilled from a single drill site to bottom hole locations throughout an established drilling district. Conversely, the absence of such a well site, therefore, would result in a taking of the property rights that the landowners and mineral owners and their lessees have in the oil and gas resources beneath their properties.

22.     The Site was zoned and approved for drilling and production of oil based on plan approvals by Los Angeles Office of Zoning Administration as part of an effort to support the California and Los Angeles energy economy. The City first approved the Site for oil and gas production on January 31, 1964 in Approval ZA 16926 ("1964 Plan Approval"). A true and correct copy of that 1964 Plan Approval is attached hereto as **Exhibit B**. The 1964 Plan Approval was supported by findings of fact and permitted wells to be drilled from the Site into Urbanized Oil Drilling District U-97, as well as Urbanized Oil Drilling District Nos. U-98 and U-99. The Zoning Administrator's findings noted that the area of the Site was primarily commercial, but with "substantial residential improvements in the immediate locality" and that the Site was "practically the only one of sufficient size not improved with substantial buildings which is available for the proposed operation." The Zoning Administrator also found: "all the normal objectionable features of oil drilling and production can be controlled so as to cause no detriment to surrounding property." Accordingly, the Zoning Administrator authorized the drilling and operation of the Wells on the Site, pursuant to the conditions set forth in the 1964 Plan Approval.

23.     Following the 1964 Plan Approval, Standard Oil Company of California drilled the discovery well in March 1965 and thereafter drilled multiple wells to different locations in what was designated as the "Los Angeles Downtown Oil Field." The Site is the only designated drill site within the field, and there is no feasible way to produce the remaining oil and gas preserves beneath the field other

1    than through the wells on the Site.

2         24.   Although the specific buildings and development in the area of the Site

3    may be different now than those present in the 1964, ultimately, the area of the

4    property has not changed in that the Site is located in a primarily commercial area

5    with residential improvements in the immediate locality. Nor has anything else

6    occurred which might indicate that the conditions set forth in the 1964 Plan

7    Approval are no longer sufficiently protective of the environmental and the health

8    and safety of residents.

9         25.   The Wells on the Site were directionally drilled and produce crude oil

10   beneath an area of property comprising approximately 680 acres in the Los Angeles

11   Downtown Field, pursuant to the "Unit Agreement for the Los Angeles Downtown

12   Field, Los Angeles, California," dated September 1, 1966, recorded November 23,

13   1966, as Document #2785, Book M2396, Page 823 in the Official Records of Los

14   Angeles County, California, as amended (the "Unit Agreement"). The Unit

15   Agreement unitized hundreds of oil and gas leases in Los Angeles (collectively, the

16   "Leases"), which comprise the Los Angeles Downtown Field Unit ("Unit"),

17   including Nasco's Wells.

18        26.   The 1964 Plan Approval "authorizes the use of [the Site] as a

19   controlled drill site on which to drill wells and conduct surface operations in

20   connection with the development and bottoming of oil wells . . . , as well as for

21   surface operations in connection with wells . . . , and to maintain such equipment

22   and accessories as are necessary in the drilling for and the production of oil, gas and

23   other hydrocarbon substances." The Wells that Nasco operates on the Site were

24   drilled in reliance upon and pursuant to the oil and gas leases, which are subject to

25   the Unit Agreement and the 1964 Plan Approval.

26        27.   The Plan Approval became fully vested under California law when

27   Standard Oil Company of California, the original permittee, in good faith reliance

28   on the Plan Approval, performed substantial work by drilling wells from 1965 on,

1    and incurred substantial financial and other liabilities, and implemented the terms of

2    the Plan Approval by constructing facilities on the Site and drilling, equipping, and

3    operating the Wells. When the Plan Approval was issued, neither the City nor the

4    permittee contemplated that any further discretionary permits or approvals would be

5    necessary to drill and operate the Wells and the Site. When the Plan Approval was

6    issued, the permittee then obtained all necessary discretionary approvals for the oil

7    production operations on the Site.

8       28.    On July 20, 1995, pursuant to an application by Nasco's predecessor in

9    interest, St. James Oil Corporation, the Zoning Administrator modified the 1964

10   Plan Approval to authorize St. James to redrill an existing well in Approval ZA

11   16926 (PAD).  The Zoning Administrator also found that: "There is no evidence that

12   the 'Broadway Drill Site' has not been operated in accordance with all conditions

13   imposed under previous grants . . . ." A true and correct copy of the 1995 Plan

14   Modification is attached hereto as **Exhibit C** (the 1964 Plan Approval, as modified

15   by the 1995 Plan Modification, is referred to as the "Plan Approval").

16       29.    Nasco currently operates the Site pursuant to its Leases subject to the

17   Unit Agreement and in accordance with the Plan Approval. Nasco acquired the Site,

18   the Unit, and the Leases in 2013 and is the current lessee under the Leases and

19   approved operator of the Unit.

20       30.    Nasco has the exclusive right under its Leases and Unit Agreement and

21   a drill site agreement to use and operate wells and other facilities on the Site for as

22   long as oil and gas can be produced from the Unit. As a result, Nasco has property

23   rights in the oil, gas, and mineral rights in those properties that comprise the Unit

24   and in those Leases.

25       31.    Nasco is also the successor to all benefits that the initial permittee

26   enjoyed under the vested Plan Approval. The Plan Approval was assignable and ran

27   with the property and the Leases, has remained validly in effect since issued, and

28   does not have a termination date. When Nasco acquired the Site, the Wells, the

Leases, and the Unit, Nasco became the holder of the vested rights. Intervening changes of law or policy by the City could not and cannot impair Nasco's vested rights since those rights were measured and determined at the time the Plan Approval was issued and vested.

32.    Based on the terms of the Plan Approval and the City's Oil Drilling District Conditions, neither Nasco nor any property owner can produce oil and gas from the Unit without utilizing the Site. There are no other permitted drill sites in the Unit. The only feasible and economically viable way to recover the oil and gas reserves from the Unit is from the operation of Nasco's Wells on the Site.

33.    As is characteristic of Southern California oil fields, many of which have been producing for more than 100 years, the Los Angeles Downtown Field still has substantial remaining oil and gas reserves than could be economically produced for decades.

34.    Nasco purchased the Site, the Wells, the Leases, and the Unit in reasonable and good faith reliance on the Plan Approval, performed substantial work itself, and made significant financial investments. Nasco made such acquisition in good faith reliance upon and with the understanding that it was acquiring all rights, title, and interest in the permits necessary for the operation of the Wells on the Site and conducting oil and gas production operations on the Site. Nasco would not have made its initial investment in the acquisition of the Site, the Wells, and the Leases or its subsequent substantial investments in improving the operations on the Site without such understanding, and its reliance on the vested rights in the Plan Approval was reasonable. Accordingly, Nasco has a recognized economic interest and vested rights in the Plan Approval and the Leases comprising the Unit and a vested right to continue to conduct its operations pursuant to the Plan Approval.

35.    Nasco acquired the Site the Wells, the Leases, and the Unit and made a considerable financial investment in the Wells and the Site based on the prospect of

producing the remaining oil and gas reserves to be recovered from the Unit over an extended period of time, less Nasco's costs associated with recovering same. Nasco had reasonable investment-related expectations that it would receive a profit on its investment in reliance on the vested Plan Approval. Nasco made these investments in compliance with all applicable environmental, health, and safety regulations.

36.    Since Nasco's acquisition of the Site and the Unit in 2013, Nasco has complied with all valid conditions of the vested Plan Approval at all times.

37.    As alleged in further detail below, by changing zoning laws in a manner in a way that makes it impossible to operate its business, and in attempting to interpret exiting laws in a patently unreasonable improper manner and otherwise restricting or prohibiting operations authorized by the Plan Approval, the City effects a taking of Nasco's vested property rights for which it is constitutionally required to pay just compensation to Nasco.

## II.    Defendants Engage, Without Any Legitimate Legal Basis, in a Years-Long Effort to Deprive Nasco of Its Vested Property Rights.

38.    Defendants have engaged in a successive, unfounded, abusive, and illegal efforts to deprive Nasco of its vested property rights.

### A.    Councilmember Kevin de León Falsely Accuses Nasco of Unsafe Operations.

39.    As part of a failed run for Mayor of Los Angeles in 2022, Los Angeles Councilmember Kevin de León decided to stake out a position against oil production in Los Angeles. He decided to make Nasco a focal point of his platform, even campaigning outside of the Site.

40.    Seeking a win in his otherwise lackluster and ultimately unsuccessful campaign, Councilmember de León sought to pressure the City's Planning and Zoning Department and the Office of the Zoning Administrator to shut down Nasco despite no basis in law or fact to do so.

41.    On March 8, 2022, Councilmember de León wrote a letter to Defendant

1    Chief Zoning Administrator for Los Angeles Estineh Mailian, claiming Nasco was

2    "reckless and negligent of public safety," based upon a variety of false,

3    unsubstantiated and speculative claims of conduct by Nasco (the "March 8, 2022

4    Letter").

5    42.    On the basis of these false claims, Councilmember de León demanded

6    that defendant Chief Zoning Administrator Mailian revoke Nasco's vested Plan

7    Approval and investigate alleged civil and criminal statutory violations by Nasco.

8    Although Nasco is shown on the March 8, 2022 Letter as a recipient,

9    Councilmember de León's office did not send the letter to Nasco until June 22,

10   2022—nearly three months later. A true and correct copy of the March 8, 2022

11   Letter is attached hereto as **Exhibit D**.

12   43.    Councilmember de León had no evidentiary or legal basis for his

13   claims.

14   44.    Prior to the March 8, 2022 Letter, Nasco's attorneys made a request to

15   Councilmember de León pursuant to California Public Records Act, Government

16   Code sections 6250, et seq. on July 6, 2021 ("Nasco's PRA Request," a true and

17   correct copy of which is attached hereto as **Exhibit E**). Nasco's PRA Request asked

18   for all documents that were in the Councilmember's possession regarding each of

19   the issues raised in the March 8, 2022 Letter, including any documents concerning

20   Nasco, the Broadway Drill Site, and the Wells. Months later, Councilmember de

21   León's office ***produced just four documents*** on September 1, 2021, none of which

22   mention any of the issues raised in the March 8, 2022 Letter.

23   45.    In other words, Councilmember de León was either withholding

24   relevant documents and information from the public, in violation of the PRA, or his

25   claims against Nasco, which led to the proceedings described below, were based on

26   nothing but an unprincipled attack on a small business without any evidentiary

27   foundation.

28   46.    Nasco responded to Councilmember de León's false accusations by

letter dated July 28, 2022, with a copy to Chief Zoning Administrator Mailian, directly refuting, with evidence, each of his accusations. A true and correct copy of Nasco's July 28, 2022 letter, without attachments, is attached hereto as **Exhibit F**.

### B.    Defendant Mailian Threatens Nasco With Fines and Suspension Based Solely on the Councilmember's Unfounded Claims.

47.    Despite the fact that Nasco already held vested rights under the 1964 Plan Approval and 1995 Plan Modification, and without investigating Councilmember de León's misstatements, on September 9, 2022, Chief Zoning Administrator Mailian sent Nasco a letter, demanding that Nasco file "a Plan Approval application for the purpose of a review of compliance with the conditions imposed under" the 1964 Plan Approval and 1995 Plan Modification (the "September 9 Letter").

48.    The September 9 Letter also demanded that Nasco pay "all requisite fees, as governed by Section 19.01 of the [Los Angeles Municipal Code]." Mailian also threatened to modify, discontinue, or revoke the previously-issued Plan Approval. A true and correct copy of the September 9, 2022 letter, without attachments, is attached hereto as **Exhibit G**.

49.    The September 9, 2022 Letter provided no legal authority for any such procedure under the City's Municipal Code—because there is none—under which the City or Defendant Mailian could require Nasco to re-submit a plan approval application when Nasco already held the 1964 Plan Approval and 1995 Plan Modification, let alone require Nasco to pay for any fees associated with any such application.

50.    On October 7, 2022, Nasco responded to Defendant Mailian's September 9, 2022 letter, again refuting the unfounded claims by Councilmember de Léon that Nasco was not complying with the terms of the Plan Approvals. A true and correct copy of Nasco's October 7, 2022 letter is attached hereto as **Exhibit H**.

51.    On November 16, 2022, Mailian sent Nasco another letter ("November

1   16 Letter"), again demanding that Nasco submit a plan approval application.

2   Mailian also referred to this as a "compliance review application." Mailian also

3   demanded that Nasco pay $17,696.15 as "application fees for a Compliance Review

4   . . . per LAMC Section 19.01-E ('Modification or Review by ZA')." This time

5   Mailian threatened that Nasco's failure to submit a plan approval (compliance

6   review) application "may result in a delinquency status for [Nasco's] land use

7   application" and that the City would submit the application for Nasco and

8   unilaterally charge Nasco $74,873.93. A true and correct copy of the November 16,

9   2022 letter, without attachments, is attached hereto as **Exhibit I**.

10        52.    By letter dated December 5, 2022, Nasco's counsel responded to each

11  of the assertions set forth in Mailian's November 16, 2022 letter. In that letter,

12  Nasco's counsel pointed out that Mailian has no grounds or authority to unilaterally

13  demand Nasco submit any plan approval (compliance review) application or to

14  demand Nasco to pay any fees associated with such application. Nasco asked

15  Mailian to rescind and withdraw the demand that Nasco submit a "Plan Approval

16  (Compliance Review)" along with a $17,696.15 filing fee (or any other amount),

17  which demands were predicated on baseless accusations by Councilmember de León

18  and absent any statutory authority. A true and correct copy of the December 5, 2022

19  letter is attached hereto as **Exhibit J**.

20        53.    Mailian responded to Nasco's December 5, 2022 letter by letter dated

21  December 15, 2022 ("December 15 Letter"). In that letter, the Chief Zoning

22  Administrator stated that Defendants will "move forward with nuisance abatement

23  proceedings pursuant to Los Angeles Municipal Code (LAMC) Section 12.27.1."

24  Defendants never withdrew their illegal demand for Nasco to submit plan approval

25  (compliance review) application and for Nasco to pay fees. A true and correct copy

26  of the December 15 Letter, without attachments, is attached hereto as **Exhibit K**.

27  Mailian's correspondence made clear that Defendants are moving forward with

28  regulatory action against Nasco ***because Nasco refused to comply with their***

*demands* that Mailian had no authority to make.

**III.    Defendants Never Had a Legal Basis for the Threatened Legal Action.**

54.    The December 15 Letter does not identify any conditions maintained by Nasco on the Site which would be considered a nuisance as of the date of the letter. As of the date of this Complaint, the Defendants have not identified any current condition on the Site that would be a nuisance. Accordingly, the Defendants did not have, nor do they currently have, any factual or legal basis to commence any nuisance abatement proceedings against Nasco under the City's Municipal Code.

55.    Essentially, the Zoning Administrator has made a mockery of due process by trying to weaponize the Los Angeles Municipal Code and made it impossible for Nasco to satisfy the Zoning Administrator's moving target of demands. The Zoning Administrator has abused and has exceeded her legal authority and has acted arbitrarily by:

a.    Demanding that Nasco submit a "plan approval" application accompanied by the "requisite fees," when the Municipal Code specifically does not contemplate or require any such application;

b.    Demanding that Nasco submit a "compliance review" application and pay the City $17,696.15 in application fees, when the Municipal Code specifically does not contemplate or require any such application or the payment of any such fees;

c.    Asserting that the City Planning Department will unilaterally submit "compliance review" application on behalf of Nasco and charge Nasco $74,873.93 in fees, when the Municipal Code specifically does not contemplate or authorize the City Planning Department to unilaterally submit any such application or authorize the imposition of any such fees; and

d.    Threatening to move forward with nuisance abatement proceedings against Nasco when no nuisance condition has been identified on the Site.

56.     As explained herein, each of these actions taken by the Defendants has been unfounded in law or fact and have been taken for the purpose of retaliating against Nasco for not submitting to the patently unlawful demands by the City and Councilmember de Leon.

A.     **Chief Zoning Administrator Mailian Does Not Have Authority to Demand that Nasco Resubmit a Costly Plan Approval Application.**

57.     Mailian claims she had authority to demand Nasco submit a plan approval application pursuant to Los Angeles Municipal Code section 12.27.1. While Los Angeles Municipal Code section 12.27.1 states the purpose, authority and procedure for administrative nuisance abatement proceedings, nothing in this section allows for Mailian to demand Nasco to re-submit a plan approval application or revoke Nasco's land use application if Nasco failed to do so. In fact, "[t]hese provisions allow the City's zoning authorities to protect the public peace, health and safety . . . *while protecting the constitutional rights of the parties involved*."  (L.A. Mun. Code, § 12.27.1(A), emphasis added.)

58.     To abate a nuisance under the Municipal Code, Section 12.27.1 requires the City to provide notice, hold a hearing, and for the Planning Director make written findings based on evidence which the Director has observed. Defendants have followed none of these procedures prior to demanding that Nasco submit a "plan approval application."

59.     Mailian's demands and threats to revoke Nasco's land use permits without notice or due process clearly violates Nasco's constitutional rights.

60.     In other words, the Defendants' actions and threatened actions presuppose, without supporting evidence, that Nasco maintains nuisance conditions or that Nasco violated the conditions of the 1964 Plan Approval, 1995 Plan Modification, or statutes without notice, hearing, evidence, or formal findings. The Defendants base their actions on hearsay and unsubstantiated and unproven claims by Councilmember de León and other agencies.

61.    Neither Mailian nor any City planning official ever observed or experienced the purported violations of which they accuse Nasco.

**B.    Chief Zoning Administrator Mailian Cannot a Demand a Compliance Review (or Any Payment of Fees Therefor) Absent Nuisance Abatement Proceedings.**

62.    The Zoning Administrator has taken the position that she has authority to unilaterally demand Nasco submit a to a compliance review and demand that Nasco pay $17,696.15 in application fees pursuant to Los Angeles Municipal Code section 19.01-E.

63.    However, a compliance review is one of the potential remedies that can be considered *after* notice and hearing in a nuisance abatement proceeding. Los Angeles Municipal Code section 12.27.1(C)(3) clearly states:

> ***Upon any finding of nuisance or non-compliance with existing conditions imposed on the land use or discretionary zoning approval***, the Director's determination shall impose a condition requiring the business operator or property owner to file a Plan Approval application for Review of Compliance with Conditions within two years of the effective date. At the discretion of the Director, the due date for the Plan Approval application can be set for 90 days, 180 days, one year, 18 months or two years from the effective date of the Director's determination or the Council action on appeal.

(Emphasis added.)  Here, there has been no finding of nuisance or non-compliance with existing conditions on Nasco's part, other than hearsay and unsubstantiated claims by Councilmember de Léon.

64.    Section 19.01-E also does not give the Zoning Administrator any authority to demand that Nasco pay $17,696.15 in application fees for any "plan approval (compliance review) application."  On its face, Section 19.01-E applies to "fees [to] be charged pursuant to Section 12.24 of this Code to applicants seeking the following permits, interpretations or approvals."  Section 12.24 relates to conditional use permits; none of those provisions apply to any purported "plan

1  approval (compliance review) application" that the Zoning Administrator has

2  demanded from Nasco.

3       65.    Therefore, Mailian has no grounds to demand for that Nasco submit to

4  a compliance review and pay fees for such review when no nuisance abatement

5  proceedings have been initiated against Nasco, Nasco has not had any opportunity to

6  refute any claims that it has not been in compliance with existing conditions, and the

7  Planning Director has not made any written findings of any nuisance or non-

8  compliance. Defendants' actions are a quintessential case of a violation of due

9  process when the City has attempted to impose conditions and fees on Nasco

10 without any notice or opportunity to be heard. Mailian has also engaged in a classic

11 case of abuse of power by operating outside the scope of her constitutional and

12 statutory authority.

13    **C.    Defendants Have No Authority to Unilaterally Conduct a**

14         **Compliance Review or Demand Nasco Pay Fees for Such Review**

15         **Without Notice and Hearing.**

16      66.    The Zoning Administrator has also taken the position that if Nasco

17 itself does not submit a compliance review application that the City will retaliate

18 and will file such an application on Nasco's behalf and has demanded has to submit

19 a compliance review and pay $74,873.93 *in advance* for a compliance review, which

20 Nasco has never requested. As noted above, the Zoning Administrator does not have

21 the authority under the Municipal Code or otherwise to require any "compliance

22 review" *before* any nuisance proceedings are completed. Nor does the Zoning

23 Administrator have the authority to extort payment from Nasco before there any

24 adjudicative proceeding has been finally determined.

25      67.    Any compliance review requirement could not be imposed until and

26 unless nuisance abatement proceedings have been conducted and finally completed

27 in accordance with Section 12.27.1. There would be no valid evidentiary basis to

28 support "any finding of nuisance or non-compliance with existing conditions."

Therefore, the Zoning Administrator does not have the legal authority to demand that Nasco submit an application for Compliance Review now.

68.     The fact that Defendants continued to pursue this matter at the insistence of Councilmember de León and without any evidence or legal support for the claims, solely for the purpose of harassing Nasco, raises basic questions of due process and actual bias, which ultimately taint Defendants' actions and demands.

### D.     Chief Zoning Administrator Mailian Has No Basis for Initiate Any Nuisance Abatement Proceedings.

69.     Condition 23 of the Plan Approval provides:

> That the Chief Zoning Administrator reserves the right to impose additional conditions or require corrective measures to be taken if he finds ***after actual observation or experience with drilling one or more of the wells on the subject property*** that additional conditions are necessary to afford greater protection to adjacent or surrounding property as intended by the provisions of Section 13.01 of the Municipal Code, as well as the conditions set forth in Ordinance No. 124316.

(Emphasis added.)

70.      None of the matters identified in the September 9 Letter are based on Chief Zoning Administrator Mailian's "actual observation or experience with drilling one or more of the wells on the subject property," since no drilling operations are occurring on the property and, in fact, all drilling activities on the site were completed decades ago. The matters identified in the September 9 Letter are based solely on Councilmember de León's false accusations. Therefore, no factual or legal basis exists for the Zoning Administrator to attempt "to impose additional conditions or require corrective measures."

71.     Even assuming for the sake of argument that a plausible factual and legal basis was present, the consideration of additional factors cannot be taken by the Zoning Administrator unilaterally without a hearing followed by findings of fact, subject both administrative appeal and judicial review. No such hearing has taken place. The authority cited in the September 9 Letter for requiring a compliance

review, Section 12.27.1(C)(1), requires a noticed hearing and written decision "supported by written findings, including a finding that the Director's determination does not impair the constitutional rights of any person." Here, no such nuisance abatement proceedings under Section 12.27.1 have occurred, nor has the Director made any written findings after a hearing and consideration of any evidence, let alone findings explaining why the Director's determinations do not impair Nasco's constitutional rights.

72.     Furthermore, the Zoning Administrator has no factual or legal basis to support any review or modification of Nasco's conditional use permit or to otherwise infringe on Nasco's vested rights to operate under the Plan Approval.

73.     Therefore, the City has applied its municipal code to unconstitutionally force Nasco to pay for nuisance abatement proceedings before establishing any nuisance.

74.     The City's procedure for conducting administrative nuisance abatement proceedings is set forth in Section 12.27.1 of the City's Municipal Code. Nasco is informed and believes and thereon alleges that this procedure was amended by Ordinance No. 180,409, effective Jan. 18, 2009, and most recently by Ordinance No. 187,237, effective Dec. 27, 2021. Nasco is informed and believes and thereon alleges that at some time after the Plan Approval was issued, the City amended its administrative nuisance abatement procedures in a manner that, as improperly applied by Defendants, would unconstitutionally require a permittee as a condition to defend itself in such proceedings, to pay for such nuisance abatement proceedings and pay the full cost of the City's investigative and prosecutorial costs, even where, as here, there has been no valid finding of any actual nuisance caused by the permittee.

**IV.   Councilmember de León's Personal and Political Conflicts of Interest Invalidate Any and All Proceedings in Which He Is Involved.**

75.     The protections of procedural due process apply to administrative

proceedings. Due process, however, requires a relatively level playing field, in other words, a fair hearing before a neutral or unbiased decision maker. Due process in an administrative hearing also demands an appearance of fairness and the absence of even a probability of outside influence on the adjudication. Here, Nasco faces a situation in which any appeal of decision would be to the City Council, of which Councilmember de León remains a sitting member.

76.     Councilmember de León's obvious political demand that the Chief Zoning Administrator revoke Nasco's Plan Approval was a heavy handed attempt to direct the Chief Zoning Administrator to determine in advance any nuisance abatement proceedings in a particular manner. Those acts coupled with Councilmember de León's position of influence over the Zoning Administrator and the Planning Department creates independent due process concerns and confirms a fundamental flaw in the entire adjudicative process. Allowing the Zoning Administrator to proceed with nuisance abatement proceedings under these circumstances violates Nasco's constitutional due process rights.

77.     By allowing Councilmember de León to act both as an advocate and an ultimate decision maker violates Nasco's fundamental constitutional rights to due process and taints the entire proceedings threatened by Defendants.

**V.      Nasco Lacks an Administrative Remedy to the Defendants' Abuse of Power.**

78.     All efforts by Nasco to work with Councilmember de León and the Defendants have proved fruitless. Nasco offered to meet with both Councilmember de León and the Defendants to address any concerns that they might have regarding its operations and the baseless accusations made against it. None of them responded. Instead, without any evidence, they have persisted in a course of action intended to take Nasco's protected property and economic rights without compensation and to impose fines and fees on Nasco to drive Nasco out of business.

79.     Nasco has exhausted all feasible and applicable administrative

remedies to the extent required by law. Furthermore, any further efforts by Nasco to any applicable exhaust administrative remedies would be futile.

80.     Nasco's constitutional rights have already been seriously and materially infringed, and unless this Court intervenes, the Defendants will use any pretext to accomplish their goal of revoking Nasco's Plan Approval and putting it out of business.

81.     The Defendants' actions have already caused Nasco severe and irreparable damages. The Defendants' efforts to deprive Nasco of its vested rights will continue to cause irreparable damage to Nasco.

82.     Nasco's operations in downtown Los Angeles are particularly under the spotlight. Despite Nasco's clear vested interests in the 1964 Plan Approval and 1995 Plan Modification and right to operate oil wells at the Site, the City intends to circumvent Nasco's due process rights and impede on Nasco's vested interests in order to shut down Nasco's operations imminently, without waiting years to do so and without any pretense of even trying to manage the obvious constitutional problems with such a taking of property without just compensation.

## VI.    The City's Express Policy Is to Eliminate All Oil and Gas Production.

83.     The City has already made clear that it intends to pursue a policy to ban the drilling of new oil wells and phase out all drilling within city limits.

84.     On December 2, 2022, the City Council approved an ordinance to ban new oil extraction and shut down existing operations within 20 years. On January 18, 2023, Ordinance No. 187709 ("Ordinance"), amending Sections 12.03, 12.20, 12.23, 12.24, and 13.01 of the Los Angeles Municipal Code, became effective.

85.     The Ordinance, among other things, would make the operation of the Wells a nonconforming use of land within the City, and prohibits the maintenance, drilling, re-drilling, or deepening of existing oil and gas wells, including Nasco's Wells on the Site.

86.     The recoverable reserves in the Downtown Lod Angeles Field will not

COMPLAINT

be fully produced within 20 years. Simply put, the impact of the Ordinance would be to put Nasco out of business. By placing an end date on the production of all oil and gas resources in the City, the Ordinance virtually eliminates the economic value of Nasco's vested interests in the oil and gas reserves beneath the Unit, the Wells, and all of Nasco's other facilities  the Leases and the Unit Agreement and effects a temporary and permanent taking of Nasco's property rights without just compensation.

## VII.    The Damage Done.

87.    The Zoning Administrator has already claimed that Nasco's land use operation may be in a "delinquency status" if Nasco failed to file a "plan approval" or "compliance review" application. In essence, the Zoning Administrator has taken away Nasco's vested property rights without due process and in retaliation for Nasco's refusal to comply with the Zoning Administrator's and Councilmember de León's illegal demands. The damage done to Nasco is neither hypothetical nor illusory. The fact that the Zoning Administrator has already, in writing, claimed that Nasco's land use operation may be in delinquency status infringes on Nasco's property rights and jeopardizes Nasco's ability to continue to lawfully operate its business.

88.    The process by which the Defendants have threatened Nasco under the City's nuisance ordinance denies Nasco its fundamental right of procedural due process. Under the Section 12.27.1 of the Municipal Code, any appeal and final action will have to be determined by the City Council, including Councilmember de León who initiated this effort and has placed improper political pressure on the other Defendants to utilize the nuisance abatement ordinance to put Nasco out of business. Councilmember de León seeks to be Nasco's prosecutor, judge, jury, and executioner.

89.    Defendants do not have legal authority for their claim that the City can arbitrarily file an application on Nasco's behalf and then charge it $74,843.93 as

asserted in the November 16 Letter. Accordingly, there is no basis for the assertion that Nasco is required to either "file a Plan Approval (Compliance Review)" and or to pay a filing fee of $17,696.15—or any other amount.

90.     Neither Section 12.27.1 or Section 19.01 of the Municipal Code can be construed to allow the City to force Nasco to pay the costs for an investigation of baseless accusations against it without a hearing. Nasco has not made any application for a review of its conditional use permit. In any event, Article XIII C, section 2 of the California Constitution, among other provisions, would prohibit any such charge by the City.

91.     Constitutional due process requirements apply to municipal administrative proceedings. As a matter of law, a municipal code requirement that a party to an administrative proceeding pay for the cost of the adjudication is facially unconstitutional.

92.     As a result of the Defendants' unconstitutional, arbitrary, and improper acts, which seek to impose costs on Nasco, have placed a cloud over and thereby negatively impacted the value of Nasco's property interests, and have impeded Nasco's ability to attract investment, Nasco has suffered damages including the reduced market value of the Wells and its reserves in the field.

## FIRST CAUSE OF ACTION

### Inverse Condemnation – Unconstitutional Taking of Property

### (42 U.S.C. § 1983; U.S. Const. amend. V; Cal. Const. art. I, § 19)

93.     Nasco realleges each and every allegation contained in the foregoing paragraphs 1 through 92 as though fully set forth herein.

94.     The September 9 Letter, November 16 Letter, December 15 Letter, the Ordinance, and the actions of the Defendants deny Nasco all economically beneficial or productive use of its mineral estate in the name of the common good and constitutes a categorical regulatory taking.

95.     Alternatively, the September 9 Letter, November 16 Letter, December

15 Letter, the Ordinance, and the actions of the Defendants effect a compensable taking under the test set forward in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). The September 9 Letter, November 16 Letter, December 15 Letter, the Ordinance, and the actions of the Defendants eliminate virtually all economic value of Nasco's property and put an ongoing cloud over Nasco's property rights and their economic value. Furthermore, these acts interfere with Nasco's reasonable expectation it could continue its existing, lawful, and fully vested oil and gas and injection operations at the Site. Nasco has long relied upon the Plan Approvals for its oil and gas operations, consistent with its vested rights. Nasco has a fully vested right to continue operations pursuant to the Plan Approvals, which are necessary for its associated development and production of oil and gas at the Site. Finally, the character of Defendants' conduct is akin to a physical taking of Nasco's property and provides no countervailing benefits that would offset the costs imposed.

96.    The City has offered Nasco no adequate or just compensation for its taking of Nasco's property rights. In fact, the September 9 Letter, November 16 Letter, and December 15 Letter demand that Nasco *pay the City* fees in connection with unlawful demands for Nasco to make filings or applications.

97.    The Ordinance also fails to provide adequate compensation for its taking. Although the Ordinance purports to offer 20-year amortization period, this amortization period was determined arbitrarily, without any justification or study supporting that this amortization period was sufficient. This amortization period is, in fact, not sufficient, because Nasco's oil and gas rights cannot be justly compensated by amortization and, even if it is, the fact that Nasco's has an indefinite right to produce oil and gas under its currently vested property rights, at 20-year period is insufficient to constitute just compensation.

98.    Because the September 9 Letter, November 16 Letter, December 15 Letter, the Ordinance, and the actions of the Defendants deprive Nasco of its rights, privileges and/or immunities as secured by the Fourteenth Amendment, Defendants

1    are liable to Nasco under 42 U.S.C. § 1983.

2        99.    As a direct and proximate result of this unconstitutional taking of

3    Nasco's property in violation of the Fifth and Fourteenth Amendments of the U.S.

4    Constitution and Article I, section 19 of the California Constitution, Nasco has

5    suffered and will continue to suffer substantial damages, plus interest, in an amount

6    to be proven at trial.

7        100.    Nasco is entitled to recover its damages, costs, including attorney's fees

8    and expert fees pursuant to 42 U.S.C. §§ 1983 and 1988 and corresponding

9    provisions of California law.

10                        **SECOND CAUSE OF ACTION**

11        **Inverse Condemnation – Unconstitutional Exaction/Condition**

12        **(42 U.S.C. § 1983; U.S. Const. amend. V; Cal. Const. art. I, § 19)**

13        101.    Nasco realleges each and every allegation contained in the foregoing

14    paragraphs 1 through 100 as though fully set forth herein.

15        102.    The September 9 Letter, November 16 Letter, and December 15 Letter

16    do not contain any findings of imminent harm, of a public nuisance, or otherwise

17    that Nasco violated the Municipal Code. Thus, there was no factual or legal basis for

18    the September 9 Letter, November 16 Letter, and December 15 Letter for any

19    determination that Nasco does not have the approval to conduct production

20    operations at the Site.

21        103.    Nasco's rights in the Wells, including the right to operate the Wells and

22    the Site according to the Plan Approvals, is constitutionally protected property.

23        104.    In imposing an unconstitutional exaction arising from the September 9

24    Letter, November 16 Letter, December 15 Letter, and actions of the Defendants,

25    including threatening to revoke 1964 Plan Approval and 1995 Plan Modification

26    without notice or hearing, the Defendants have violated the constitutional principles

27    as articulated under *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987),

28    *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water*

1   *Management District*, 133 S. Ct. 2586 (2013), and are liable to Nasco under 42

2   U.S.C. § 1983.

3       105.  As a direct and proximate result of this unconstitutional taking of

4   Nasco's property in violation of the Fifth and Fourteenth Amendments of the U.S.

5   Constitution and Article I, section 19 of the California Constitution, Nasco has

6   suffered substantial damages, plus interest, in an amount to be proven at trial.

7       106.  Nasco is entitled to recover its damages, costs, including attorney's fees

8   and expert fees pursuant to 42 U.S.C. §§ 1983 and 1988 and corresponding

9   provisions of California law.

10                 **THIRD CAUSE OF ACTION**

11         **Violation of Procedural Due Process – As Applied**

12     **(42 U.S.C. § 1983, U.S. Const. amend. V; Cal. Const. art. I, § 7)**

13       107.  Nasco realleges each and every allegation contained in the foregoing

14   paragraphs 1 through 106 as though fully set forth herein.

15       108.  In disregard of Section 12.27.1 of the Municipal Code setting out the

16   City's own procedures for a nuisance abatement proceeding, the Zoning

17   Administrator seeks to impose the costs of a Compliance Review and/or to modify

18   Nasco's approved use of the Site absent any valid evidentiary basis to support a

19   finding of nuisance or non-compliance with existing conditions.

20       109.  The Defendants, acting under the color of state law, have deprived

21   Nasco of its property without due process of law and an opportunity to be heard, and

22   are liable pursuant to 42 U.S.C. § 1983.

23       110.  Nasco has suffered damages as a proximate result of the defendants'

24   violations of its procedural due process rights, including in the amount of the

25   reduced market value of the Wells.

26       111.  These acts of the Defendants will continue to cause Nasco to expend

27   substantial sums of money to defend itself against the actions of the Defendants as

28   set forth hereinabove, and have damaged Nasco's reputation in the community

1    where it does business.

2    112.   Nasco is entitled to receive all legal and equitable remedies available

3    under the law, including compensatory damages in an amount to be determined at

4    trial, punitive damages, and nominal damages.

5    113.    Nasco is entitled to recover its costs, including attorneys' fees and

6    expert fees, pursuant to 42 U.S.C. §§ 1983 and 1988 and corresponding provisions

7    of California law.

8    **FOURTH CAUSE OF ACTION**

9    **Violation of Substantive Due Process – As Applied**

10    **(42 U.S.C. § 1983, U.S. Const. amend. V; Cal. Const. art. I, § 7)**

11    114.   Nasco realleges each and every allegation contained in the foregoing

12    paragraphs 1 through 113 as though fully set forth herein.

13    115.   The Due Process Clause of the Fourteenth Amendment protects persons

14    against deprivations of "life, liberty, or property." U.S. Cost. Amend. XIV, § 1.

15    Nasco has a substantive due process right to be free from arbitrary government

16    action.

17    116.   Through September 9 Letter, November 16 Letter, December 15 Letter,

18    and actions of the Defendants, the Defendants, acting collectively and individually,

19    have a longstanding policy or custom, which has amounted to a continuous

20    violation, of acting with deliberate indifference, malice, and bad faith against Nasco

21    in violation of its constitutional rights.

22    117.   There is no legitimate state interest or objective justifying the selective,

23    spiteful, targeted, and differential treatment to which the Defendants have subjected

24    Nasco and its attempts to continue to operate the Wells pursuant to the lawfully

25    issued Plan Approvals.

26    118.   The Defendants have deprived Nasco of its property interests in a way

27    that is so outrageously arbitrary, conscience shocking, and oppressive in a

28    constitutional sense as to be a gross abuse of government authority.

119.   The Defendants, acting under the color of state law, are liable pursuant to 42 U.S.C. § 1983 for violation of Nasco's constitutional rights to due process.

120.   As a direct and proximate result of the Defendants' deliberate actions, executed pursuant to a policy or custom, Nasco has sustained both economic and non-economic damages.

121.   Nasco is entitled to receive all legal and equitable remedies available under the law, including compensatory damages in an amount to be determined at trial, punitive damages, and nominal damages.

122.   Nasco is entitled to recover its costs, including attorneys' fees and expert fees, pursuant to 42 U.S.C. §§ 1983 and 1988 and corresponding provisions of California law.

## **FIFTH CAUSE OF ACTION**

### **Violation of Equal Protection – As Applied**

### **(42 U.S.C. § 1983, U.S. Const. amend. V; Cal. Const. art. I, § 7)**

123.   Nasco realleges each and every allegation contained in the foregoing paragraphs 1 through 122 as though fully set forth herein.

124.   Nasco is informed and believes and thereon alleges that it is being treated differently from other oil and gas operators in the City of Los Angeles in that the Zoning Administrator seeks to impose the costs of a Plan Approval Compliance Review Application on Nasco absent any valid evidentiary basis to support a finding of nuisance or non-compliance with existing conditions, to force Nasco to pay in advance the costs of $74,873.93 for a compliance review before any nuisance abatement proceedings under Section 12.27.1 have been conducted, and to threaten to revoke Nasco's land use application without due process of law.

125.   The Defendants, acting under the color of state law, are liable pursuant to 42 U.S.C. § 1983 for violation of Nasco's constitutional rights to due process.

126.   As a direct and proximate result of the Defendants' deliberate actions, executed pursuant to a policy or custom, Nasco has sustained both economic and

1    non-economic damages.

2        127.   Nasco is entitled to receive all legal and equitable remedies available

3    under the law, including compensatory damages in an amount to be determined at

4    trial, punitive damages, and nominal damages.

5        128.   Nasco is entitled to recover its costs, including attorneys' fees and

6    expert fees, pursuant to 42 U.S.C. §§ 1983 and 1988 and corresponding provisions

7    of California law.

## SIXTH CAUSE OF ACTION

### Violation of the First Amendment

### (42 U.S.C. § 1983, U.S. Const. amend. I; Cal. Const. art. I, § 2)

11       129.   Nasco realleges each and every allegation contained in the foregoing

12   paragraphs 1 through 128 as though fully set forth herein.

13       130.   The First Amendment of the U.S. Constitution and Article One, Section

14   Two of the California Constitution guarantee Nasco the rights to free expression, to

15   petition the government, and to access the courts in the operations of its oil and gas

16   business.

17       131.   In asserting its rights to contest the Defendants' unconstitutional,

18   arbitrary, and improper enforcement of state and municipal laws, Nasco was and is

19   engaging in constitutionally protected activity.

20       132.   Nasco is informed and believes and thereon alleges that the Defendants

21   have sought and are seeking to infringe Nasco's constitutional and state law

22   property rights based on Nasco's engagement in such constitutionally protected

23   activity in operating an oil and gas business and in challenging the constitutionality

24   of Defendants' actions.  In particular, as their correspondence indicate, Defendants'

25   actions—including threatening to place Nasco's land use application in delinquency

26   status, unilaterally file a "compliance review" application or "plan approval"

27   application and charge Nasco the fees for the same, and baselessly initiate a

28   nuisance abatement proceeding—are solely in retaliation to Nasco's refusal to

1  comply with Defendants' unconstitutional demands, rather than based on any legal

2  or factual authority.

3      133.   The impact of the Defendants' conduct would be to chill a person of

4  ordinary firmness from continuing to engage in constitutionally-protected activity

5  by imposing substantial economic and non-economic burdens from continuing to

6  engage in a legal business and to exercise Nasco's rights to contest the Defendants'

7  improper and unconstitutional actions.

8      134.   The Defendants, acting under the color of state law, are liable pursuant

9  to 42 U.S.C. § 1983 for violation of Nasco's constitutional rights to due process.

10     135.   As a direct and proximate result of the Defendants' deliberate actions,

11  executed pursuant to a policy or custom, Nasco has sustained both economic and

12  non-economic damages.

13     136.   Nasco is entitled to receive all legal and equitable remedies available

14  under the law, including compensatory damages in an amount to be determined at

15  trial, punitive damages, and nominal damages.

16     137.   Nasco is entitled to recover its costs, including attorneys' fees and

17  expert fees, pursuant to 42 U.S.C. §§ 1983 and 1988 and corresponding provisions

18  of California law.

19                    **SEVENTH CAUSE OF ACTION**

20          **Declaratory Judgment and For Mandate and Injunctive Relief**

21     138.   Nasco realleges each and every allegation contained in the foregoing

22  paragraphs 1 through 137 as though fully set forth herein.

23     139.   Under federal and state law, Nasco has a right to operate the Wells and

24  the Site, to be free of any law that unreasonably and impermissibly burdens its state

25  law property rights, to adequate consideration for infringement upon its

26  constitutional and state law rights, and to be free of arbitrary interference from City

27  officials.

28     140.   There is a justiciable controversy as to whether the Defendants'

conduct, on its face or as applied to Nasco, violates the U.S. Constitution, the California constitution, and/or the Municipal Code.

141.   A declaratory judgment as to whether the Defendants' conduct unconstitutionally deprives Nasco of its property, of due process, of equal protection of law, or otherwise violates Nasco's rights under the U.S. and California constitutions will clarify the legal relations between Nasco and the Defendants, and will give the parties relief from the uncertainty and insecurity giving rise to this controversy.

142.   Defendants have a clear, present, and nondiscretionary duty to comply with the terms of Los Angeles Municipal Code section 12.27.1, which lays out the procedures for nuisance abatement proceedings. Defendants have violated that duty by demanding Nasco engage in procedures not provided by Los Angeles Municipal Code section 12.27.1 and threatening Nasco with revoking its land use permits for not engaging in such illegal procedures.

143.   In order to prevent the violation of Nasco's constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, declaring unconstitutional the Defendants' acts and threatened acts in violation of Los Angeles Municipal Code section 12.27.1 and due process of law and that a writ of mandate be issued under 28 U.S.C. § 1651 and California Code of Civil Procedure section 1085 directing them to cease exceeding their jurisdiction and legal authority.

144.   Furthermore, pursuant to 28 U.S.C. § 2202 and Federal Rule of Civil Procedure 65, it is appropriate and hereby requested that this Court issue a permanent injunction and writ of mandate compelling the defendants' compliance with Los Angeles Municipal Code section 12.27.1.

## **PRAYER FOR RELIEF**

WHEREFORE, Nasco prays for judgment from this court, as follows:

1.    An award of compensatory and punitive damages for violation of Nasco's constitutional rights and the lost value of Nasco's property without just compensation;

2.    A declaratory judgment that the conduct of Defendants is unconstitutional, invalid and unenforceable against Nasco and that the Ordinance is unconstitutional, invalid, and unenforceable;

3.    For a writ of mandate under 28 U.S.C. § 1651 and California Code of Civil Procedure section 1085 directing Defendants to cease exceeding their jurisdiction and legal authority;

4.    For permanent injunctive relief enjoining the defendants from taking further action in violation of applicable statutory and constitutional law;

5.    For Nasco's costs of suit incurred herein;

6.    For reasonable attorneys' fees and expenses authorized by California Code of Civil Procedure sections 1021.5 and 1036, Sections 1983 and 1988 of the Federal Civil Rights Act of 1871, and other pertinent law; and

7.    For such other and further relief that the court deems just and proper under the circumstances of this case.

Dated: February 6, 2023

                                                    CASSO & SPARKS, LLP
                                                    JOHN J. HARRIS
                                                    JAMIE M. CHENG


                                        By:    /s/ John J. Harris
                                                    John J. Harris

///
///
///
///

1

Dated: February 6, 2023

2

HERBERT SMITH FREEHILLS
NEW YORK LLP
SCOTT S. BALBER *(pro hac vice pending)*
BENJAMIN RUBINSTEIN *(pro hac vice pending)*

3

4

5

6

By:    */s/ Scott S. Balber*
Scott S. Balber

7

8

Attorneys for Plaintiff,
NASCO PETROLEUM, L.L.C.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiff Nasco Petroleum, L.L.C. hereby demands a jury trial in the above-

3  entitled action on all claims so triable.

4

5  Dated: February 6, 2023                    CASSO & SPARKS, LLP

6                                             JOHN J. HARRIS
                                             JAMIE M. CHENG
7

8                                      By:   */s/ John J. Harris*

9                                            John J. Harris

10 Dated: February 6, 2023                   HERBERT SMITH FREEHILLS

11                                           NEW YORK LLP
                                             SCOTT S. BALBER *(pro hac*
12                                           *pending)*
13                                           BENJAMIN RUBINSTEIN (*pro hac*
                                             *vice pending*)
14

15

16                                     By:   */s/ Scott S. Balber*

17                                           Scott S. Balber

18                                           Attorneys for Plaintiff,
                                             NASCO PETROLEUM, L.L.C.
19

20

21

22

23

24

25

26

27

28

## **SIGNATURE ATTESTATION**

I, John J. Harris, hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: February 6, 2023                    _/s/ John J. Harris_____
                                            John J. Harris

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

## Ordinance No. 122,316

An ordinance amending ... sections ... of the Los Angeles Municipal Code establishing an Oil Drilling District.

THE PEOPLE OF THE CITY OF LOS ANGELES DO ORDAIN AS FOLLOWS:

Sec. 1. Subdivision 2 of Subsection G of Section 13.01 of the Los Angeles Municipal Code is hereby amended by adding thereto a new paragraph (cs), said paragraph to be as follows:

(cs) The area shown on the map which follows is hereby established as Oil Drilling District No. U-97.

# OIL DRILLING DISTRICT NO. U-97



```
          0    400   800
          SCALE  IN  FEET
   SHEET  No 516  DM 123-B-209  CPC 14032
                  126-B-209    11563
                               4308
```

Such district shall be subject to those standard conditions applicable to urbanized areas which are set forth in Subdivision 2, of Subsection E of Section 13.01 of the Los Angeles Municipal Code to the extent that they are not in conflict with the following special conditions hereby imposed.

(1) Not more than one (1) controlled drilling site shall be authorized therein, the area and location thereof and other conditions relative thereto to be established by a Zoning Administrator.

(2) The creation of this district authorizes the Zoning Administrator to initially permit the drilling and bottoming of not to exceed one (1) exploratory well thereunder, subject to all other applicable governmental restrictions and regulations, except that authority is hereby granted to the Zoning Administrator, after considering the recommendation of the City Administrative Officer, to permit the drilling of not more than seven (7) additional wells and production from a maximum of eight (8) wells thereunder.

(3) In order to bottom more than the above specified number of wells within the district, further approval of the City Council must be obtained.

(4) Upon the request of the City Administrative Officer, the applicant shall furnish to him all of the information obtained from all wells drilled into and beneath District No. U-97. Such information shall be kept confidential by the said City Administrative Officer.

Sec. 2. The zoning map attached to Section 12.04 of the Los Angeles Municipal Code is hereby amended to indicate the boundaries of the oil drilling district established by paragraph (cs) of Subdivision 2 of Subsection G of Section 13.01 of the Los Angeles Municipal Code, by combining the symbol "O" with the existing zone symbols on the portion of the map which shows the area within the district.

Sec. 3. The City Clerk shall certify to the passage of this ordinance and cause the same to be published in some daily newspaper printed and published in the City of Los Angeles

I hereby certify that the foregoing ordinance was passed by the Council of the City of Los Angeles, at its meeting of March 28, 1963.

WALTER C. PETERSON, City Clerk,
By M. B. Wilson, Deputy.

Approved April 3, 1963.
File No. 111582                        SAMUEL WM. YORTY, Mayor.
                    (C14876) Apr 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

# CITY OF LOS ANGELES

## CALIFORNIA



**SAMUEL WM. YORTY**
MAYOR

HUBER E. SMUTZ
CHIEF ZONING ADMINISTRATOR

ASSOCIATE ZONING ADMINISTRATORS
JACK BAUER
CHARLES V. CADWALLADER
ARTHUR DVORIN

DEPARTMENT OF
**CITY PLANNING**
—
**OFFICE OF
ZONING ADMINISTRATION**
—
361 CITY HALL
LOS ANGELES 12
MADISON 4-5211

January 31, 1964

Standard Oil Company of California
ATTENTION:  A. C. Riedel
Western Operations, Inc.
P. O. Box 606
La Habra, California

Fire Prevention Bureau

Department of Building and Safety

Re:  Z. A. CASE NO. 16926
Northerly of 14th Place
 between Hill  St. and
 Broadway.
Downtown District
Oil Drilling District U-97

Greetings:

In the matter of the application of Standard Oil Company of California,
lessees-operators, for determination of conditions and methods of
operation to be followed in drilling for and production of oil and
gas on an approximately 0.9-acre controlled drill site located in
the M2-4-O Zone northerly of 14th Place between Hill Street and
Broadway and which controlled drill site is to be utilized for di-
rectional drilling operations under urbanized Oil Drilling District
U-97 comprising that 156-acre area of M2 zoned property bounded
generally by Grand Avenue, Pico Boulevard, Maple Street and Washing-
ton Boulevard, and extending to 12th Street between Main and Maple
Streets, and also for surface operations in connection with the
bottoming of wells under adjoining Oil Drilling Districts U-98 and
U-99 and possible new districts to the north if production is found
and if and when the bottoming of wells is respectively permitted
under each of said districts upon separate individual application,
please be advised that the Chief Zoning Administrator has made the
following finding of facts and determination <u>permitting</u> the use of
the property as a controlled drilling site for one exploratory oil
well under certain prescribed conditions and methods of operation,
it being understood that additional wells may later be permitted
after a study has been made of the results obtained from said au-
thorized well and recommendations of the City Administrative Officer.

## FINDING OF FACTS AND DETERMINATION

After thorough consideration of the statements contained in the
application, the proceedings under City Plan Case No. 14032 and

Z. A. CASE NO. 16926                                    Page 2


Council File No. 111582 establishing urbanized Oil Drilling District
U-97 and City Plan Case Nos. 14033-35 which established Districts
No. U-98, 99 and 100 adjoining to the east and south the district
here directly involved, as well as the proceedings in connection
with Z. A. Case No. 16773 concerning applicant's former drill site
to the south in District U-71 and several other recent controlled
drill site operations in or adjacent to urban areas somewhat si-
milar to the operation here proposed, and Z. A. Cases 16557, 16679
and 16731 involving applicant's geological core holes in this
general locality, all of which are by reference made a part hereof,
as well as personal inspection of the drill site in question and
the surrounding neighborhood in all directions, and discussion of
the proposed program with applicant's representatives and the
Assistant City Administrative Officer in charge of Petroleum Ad-
ministration, I find as follows:

1.  The property to be used as the proposed controlled drill-
    ing site from which drilling and production operations
    would be conducted for wells bottomed under urbanized Oil
    Drilling District U-97 and also adjoining Districts U-98
    and U-99 if satisfactory production is discovered, involves
    an essentially rectangular-shaped parcel of land containing
    approximately 0.9 acres and classified in the M-2 Zone and
    presently utilized for automobile parking purposes by em-
    ployees at adjacent Occidental Square.  All the immediately
    contiguous and adjacent property is similarly classified in
    the M2 Zone and is largely developed with offstreet auto-
    mobile parking lots and commercial development, most of
    which are of a wholesale or service nature incidental to
    the central city area and the downtown business area which
    starts one block to the north.  However, there are still a
    number of rather substantial residential improvements in
    the immediate locality including a three-story hotel build-
    ing directly across the alley to the north and three-story
    apartment house building one-half block to both the east
    and the west.  There is also a major hospital development
    three blocks to the southwest.  The site is only one block
    removed from the C5 Zone which comprises the intensively
    developed Downtown Business District with the concentra-
    tion of existing and under construction office buildings
    comprising Occidental Square.  The Santa Monica and Harbor
    Freeways which define the southerly and westerly limits of
    the central city are located only a short distance from
    the site.  The site is not one which was directly discussed
    as a proposed controlled drilling site when the oil drill-
    ing district was created, but another drill site further
    to the southeast was discussed; however, further studies
    by the applicant oil company indicate a site in the loca-
    lity of that here involved as far more favorable to reach
    the desired objectives and the site, although intensively
    utilized for badly needed automobile parking purposes, is
    practically the only one of sufficient size not improved

Z. A. CASE NO. 16926                                    Page 3

with substantial buildings which is available for the
proposed operation.  We are informed that additional
automobile parking areas have been acquired by the owner
of the property to absorb the displaced parking on the
subject site.

2.  The proposed drill site is somewhat confined for the best
type of oil drilling operations, particularly if extensive
production is found and numerous wells are to be drilled.
However, the applicants are aware of these problems and
may have to acquire additional property or curtail the ex-
tent of operations or utilize a second drill site in one
of the other districts to develop the total area.  The ap-
plicant has requested and would like to utilize for the
first exploratory well a portable drilling mast and with-
out the full soundproofing controls normally required in
connection with recent urbanized oil drilling activity.
The Chief Zoning Administrator has carefully considered
this proposal, but considering the close proximity of
existing hotel and apartment house development, the con-
centrated commercial and parking development, the proxi-
mity to the central business district and a major hospital
and a consistent policy to which other major oil companies
have been required to adhere in the urbanized areas, and
the dangerous precedent involved in deviating from that
policy, it has been found necessary to require the same
type of soundproofed derrick and drilling operations as
required on other controlled drilling sites.

3.  In view of all of the above considerations, all features
of oil drilling and production must be strictly controlled
to eliminate any possible odor, noise, vibrations, hazards,
unsightliness, and extensive truck traffic which might
possibly affect the surrounding intensively developed com-
mercial district.  It has been proven by experience and
particularly with the drilling and production operations
now being carried on at other controlled drill sites in
urbanized portions of the City, that all the normal ob-
jectionable features of oil drilling and production can
be controlled so as to cause no detriment to surrounding
property except the conspicuous feature of the oil drill-
ing derrick which must remain on the property during the
process of drilling the several wells permitted if pro-
duction is found.  To many people such a soundproof derrick
is not objectionable during the temporary period it must
remain on the property, but to others it appears to be a
source of annoyance, essentially due to its conspicuous
reminder of the otherwise obscure oil drilling activities
and its noncompatibility with the quality of the adjacent
neighborhoods; hence, every reasonable endeavor should be
made to eliminate the conspicuousness of the derrick.  It
has been demonstrated in connection with recent drilling

Z. A. CASE NO. 16926                                        Page 4

operations on controlled drilling sites within the City
that a new type of derrick can be designed and utilized
which is approximately 25 ft. lower in height than the
customary so-called 136 ft. derrick and that the same
can be camouflaged in such a manner that it would appear
to resemble a monument rather than an oil drilling der-
rick and blend into the surroundings and the sky so as
to be relatively unobjectionable.  In view of all the
above considerations, the conditions imposed are necessary
and within the intent and purpose of Sections 13.01-E and
F of the Municipal Code to protect and preserve the sur-
rounding area for continued residential and commercial
development in keeping with the zoning and to protect the
general public and the community from any detrimental
features of oil drilling.  Furthermore, some of the con-
ditions are necessary to protect the health and under-
ground water supply of the community, as suggested by the
Chief Engineer and General Manager  of the Department of
Water and Power.

Therefore, by virtue of authority contained in Sections 13.01-E,
F and H of the Municipal Code, the Chief Zoning Administrator
authorizes the use of a site comprising Lots 7, 8, 9 and 10 Sub.
of the Center Part of the Carr Tract; Lots D, E and 29 Sub. of
the North part of the Carr Tract; and Lot C, Tract 1491, located
northerly of 14th Place between Hill Street and Broadway, as a
controlled drill site on which to drill wells and conduct surface
operations in connection with the development and bottoming of
oil wells under Oil Drilling District No. U-97 consisting of the
approximately 156-acre drilling district depicted and described
on the map which is a part of Ordinance 124316 which map by re-
ference is made a part hereof for a description of said district,
as well as for surface operations in connection with wells which
by subsequent action may be authorized to be bottomed under ad-
jacent oil drilling districts, and also authorizes the drilling,
completion, and maintenance on said controlled drill site of one
exploratory oil well, and for the production from said well, if
successful, of oil, gas, and other hydrocarbon substances and to
maintain such equipment and accessories as are necessary in the
drilling for and the production of oil, gas and other hydrocar-
bon substances, upon the following terms and conditions:

1.  That all the conditions set forth in Section 13.01-E,2
    as well as Conditions Nos. 1, 3, 4, 5, 8, 9, 17, 18, 33,
    37, 40, 43, 47, 49, 50, 54, 58 and 59 of Subsection F of
    Section 13.01 of the Municipal Code are included in and
    by reference made a part of this approval and shall be
    complied with to the same extent as if herein restated
    in detail.

2.  That in no event shall the base of the derrick used in
    drilling operations project more than one ft. above the
    highest elevation of the public sidewalk along the west-
    erly side of the site.  Furthermore, that the derrick

Z. A. CASE NO. 16926                                        Page 5

utilized for drilling operations shall consist of the
new-style derrick such as utilized by the applicant on
its previous drill site in District No. U-71 and which
does not employ the usual "gin pole" house extending
above the crown block and upper platform, and in no
event shall the over-all gross height of said derrick and
acoustical quilt covering the same exceed a height of 141
ft. above the sidewalk elevation referred to above.  It
is understood the standard 136 ft. derrick used in this
operation shall be shortened by redesigning to meet the
height limitations specified above.  Furthermore, that
tanks and other equipment and buildings used in drilling
and production activities shall be located on the site
in such manner that no portion of the tanks, equipment,
or buildings, other than the upper portion of the derrick
drawworks house and drilling equipment buildings, tempo-
rary mud and water storage tanks and future portable
drilling mast used for servicing activities, will extend
for any appreciable distance above the enclosing fence or
wall surrounding the drilling site as hereinafter specified.

3.  That the controlled drill site shall be enclosed with an
ornamental masonry wall, solid ornamental grapestake fence
or painted board fence having a height of at least 7 ft.
above the level of the adjacent property outside of the
enclosing fixture, said enclosing fixture to observe a
minimum setback of 5 ft. from the property lines along
both Hill Street and Broadway.  Furthermore, that the
setback space adjacent to both streets shall, concurrently
with construction of the permanent enclosing fixtures, be
landscaped by the planting of lawn, ivy or other green
ground cover interspersed with trees and shrubs, all of
said landscaping to be maintained in first-class attrac-
tive condition at all times.  In the event that the oil
drilling program is successful and the site is to be re-
tained and utilized for other oil wells and for production
purposes as herein or hereafter authorized, and in the
event a grapestake or painted board fence was utilized
as the enclosing fixture around the first test oil drill-
ing area, then concurrently with moving the derrick and
drilling a second well upon the property, such wooden
type fence around the borders of the drilling site shall
be replaced with an ornamental tinted concrete block en-
closing fixture complying in height and location to that
specified above, and at the same time the minimum 5 ft.
setback space along the street borders of the drilling
site shall be landscaped and maintained in the same man-
ner as specified above.

4.  That all portions of the derrick and drawworks for the
first exploratory well herein authorized shall be located

Z. A. CASE NO. 16926                                    Page 6

at least 90 ft. from any part of the adjoining Portsmouth
Hotel building across the alley to the north.  Any tanks
or pits not housed within the mud pump-shaker building
and utilized for the storing of circulating fluid or waste
materials shall be kept covered at all times drilling is
proceeding into or through oil or gaseous formations which
might produce odoriferous cuttings or waste materials with
any vents from such facilities directed away from the ad-
jacent hotel.

5.  That in addition to soundproofing the derrick and other
structures as required by Condition No. 47 of said Section
13.01-F, soundproofing shall also be provided for the
electrical distribution center and control house con-
taining automatic electric switches and for the engine,
shakers, and mud pumps and for the doors providing ingress
and egress to the derrick, and that said doors be kept
closed except for short intervals when actually being
used for ingress and egress purposes and for placing or
removing materials and supplies in or from the derrick.
Furthermore, that the manner in which the soundproofing
is to be accomplished, including a plot plan specifying
location of involved buildings or structures and tanks,
landscaping of premises, location and type of surfacing
on access driveways and other details for the development
of the site, together with plans for each of the buildings
and tanks to be placed on the site, shall be submitted to
and approved by a Zoning Administrator prior to the issu-
ance of the drilling permit for the proposed wells and
prior to issuance, respectively, of permits for any such
buildings or tanks; said soundproofing material as re-
quired above to be of a fire resistive type approved by
the Los Angeles Fire Department.  If an acoustical quilt
type covering is utilized to soundproof the derrick and
buildings, said quilt covering shall be stretched tight,
hung and maintained in such manner that it will have a
tight attractive non-sagging appearance.

6.  That the upper portions of the soundproofed derrick which
extend above the walls surrounding the drilling site
shall be painted and camouflaged in such manner as to
blend into the adjacent buildings, landscaping and sky
or present the appearance of an attractive monument
rather than a covered oil derrick.  The designs of such
camouflage treatment shall be submitted to the Adminis-
trator for approval with plans for soundproofing the
derrick, and thereafter the upper portions of the derrick
shall be treated and maintained in the manner suggested
and approved, all of which shall be designed to eliminate
as far as practical the conspicuousness of the derrick
from the adjacent residential areas.  It is understood
that the same type of derrick design and camouflage

Z. A. CASE NO. 16920                                          Page 7

treatment thereof heretofore approved for the drilling
operation conducted by applicant on the drill site in
District U-71 (Z. A. Case No. 16080) may be utilized on
the drilling site here in question.  However, if the
first test wells upon the site prove to be successful
and additional wells are to be drilled thereon, then,
considering the conspicuousness of the drill site from
adjacent freeways and high-rise office buildings, and
if deemed necessary by the Chief Zoning Administrator,
any acoustical quilt type covering for the first test
well equipment shall either be replaced or covered with
a more rigid permanent type of attractive soundproof
enclosing fixture giving the derrick more the appear-
ance of a monument, all in keeping with plans approved
by the Chief Zoning Administrator.

7.  That a parking area shall be provided on the drilling
site for use by vehicles employed in drilling and main-
taining of oil wells on the property, and a similar
parking area shall be provided on the drill site or
immediately adjacent thereto in the M2 Zone for the
parking of automobiles of employees engaged in the
drilling and production activities.  The driveways
necessary on the drilling site, as well as the required
employee and equipment parking area, shall be paved with
rock and oil or asphaltic paving materials suitable to
withstand heavy trucking operations, and that all such
driveways and parking areas shall be regularly washed
down, swept or otherwise kept free of accumulated cement,
dust, or other materials which would produce dust in the
use of said facilities.

8.  That in addition to landscaping the 5 ft. setback space
along the street frontages and considering the limited
nature of the site, every endeavor should be made in
connection with the permanent enclosing wall along the
streets to provide indented tree planting wells or niches
for trees and shrubs which will enhance the final appear-
ance of the site.  The Chief Zoning Administrator reserves
the right, after approving plans for the landscaping treat-
ment and particularly after the derrick has been erected,
to specify the transplanting of additional trees at va-
rious strategic locations upon or adjacent to the site if
observation indicates that such additional trees would
assist in accomplishing the screening effect desired.

9.  The drilling of the wells shall be conducted in accord-
ance with good oil field practice and the latest tech-
niques and refinements in equipment and materials shall
be used.

10.  The latest and most effective blow-out prevention equip-
ment shall be installed and maintained in connection with
the drilling of any well.

Z. A. CASE NO. 16926                                    Page 8

11. That as further amplification of Condition No. 49 of
    Section 13.01-F of the Municipal Code, except for
    actual drilling and production operations, no work
    shall be conducted on the property between the hours of
    7:00 p.m. of one day and 7:00 a.m. of the following day
    or on Sundays.

12. This grant only authorizes the drilling of one explora-
    tory oil well and bottoming the same under District U-97.
    In no event shall said well be drilled into or bottomed
    under any property beyond said District U-97 unless and
    until specifically authorized by a Zoning Administrator
    under separate application.  It is understood that the
    Administrator under separate application may permit ex-
    ploratory wells under adjoining oil drilling districts
    and as provided in Paragraph 2 (of Paragraph cs),
    Section 13.01-G,2 of the Municipal Code, the Adminis-
    trator, under separate application, may approve addi-
    tional wells upon this drill site after considering the
    recommendation of the City Administrative Officer based
    upon results of the exploratory well or wells.  Further-
    more, that prior to the approval or issuance of Fire
    Department permits for each well to be drilled upon the
    subject site, there shall be supplied to the Zoning
    Administrator a map showing the general direction and
    general bottom hole location of said proposed well so
    that proper records can be kept as to the number of wells
    bottomed and completed under said district in compliance
    with the terms of this grant and the provisions of para-
    graph (c), Section 13.01-E,2 of the Municipal Code.
    Furthermore, the applicants or operators of the oil
    drilling activities herein authorized, upon request by
    the Chief Zoning Administrator, shall furnish such ad-
    ditional information concerning the status, exact bottom
    hole location, productivity, etc., of the various wells
    drilled from the property, as to enable the Administrator
    to properly and intelligently administer the oil drilling
    regulations in this area; said information to be either
    verbal or in writing and to be kept confidential by the
    Administrator if so desired by the applicants.

13. That if any of the wells hereby or hereafter authorized
    are successful and are to be maintained as producing
    wells and are required to be pumped, then said wells
    shall be equipped with Kobe or comparable producing
    units which shall be placed in pits or cellars below
    the surface of the ground so that no visible pumping
    units will be above the ground adjacent to the surface
    location of the wells and that wells shall be serviced with
    only portable type equipment.  Furthermore, that the tri-
    plex pump units necessary to operate the Kobe or comparable
    oil well  pumping units as well as the compressors for

Z. A. CASE NO. 16926                                   Page 9

compressing the gas to meet pipeline specifications,
shall be housed in substantial buildings which have
been acoustically treated so as to be substantially
soundproofed.

14. That all oil and gas produced from the wells on the
property shall be transported from the drilling site
only by means of underground pipeline connected directly
with the producing pump or with tanks or treating fa-
cilities by a completely closed system without venting
products to the atmospheric pressure at the production
site and in no event shall there be any storage or
treatment facilities on the property other than neces-
sary to conform production to pipeline requirements.
In no event shall more than three-day storage or two
1,000-barrel tanks, whichever is greater, be erected
or maintained on the property. Furthermore, that said
production tanks shall be so placed and located with
respect to enclosing fixtures surrounding the site as
to not be visible to persons on adjacent public streets
or from adjacent residential property having approxi-
mately the same ground level elevation as the average
ground level surrounding the drill site.

15. That all tools, pipe and other equipment in connection
with the drilling and production activities shall be
stored and kept on the drilling site within the walled
and landscaped enclosure.

16. After completing the exploratory test well herein au-
thorized, and provided authorization has been given
for additional wells within the drilling site, the bores
of additional wells shall be projected directionally
under District No. U-97 and adjoining districts if and
when authorized under said districts so that a complete
and adequate test of the location, extent, character,
density and productivity of any producing oil zones may
be had from the single drill site area. Said additional
wells shall be drilled with due diligence so as to com-
plete the total number of wells authorized within the
shortest possible time, utilizing only one oil drilling
derrick for said operations. Furthermore, that upon
completion of each well, the derrick shall be removed
or moved to the site for a new well on the drilling
site and work started toward drilling said new well
within the 30-day period referred to in Condition No.
4, Section 13.01-F, to the end that the derrick and
drilling operations will be removed and discontinued
on the site in the shortest period of time possible.

17. That any owner, lessee or permittee and their successors
and assigns, as well as the concern which is to actually
do the drilling work, if different than the above, must

Z. A. CASE NO. 16926                                    Page 10

at all times be insured to the extent of $2,000,000
against liability in tort and public liability and
property damage arising from drilling or production,
or activities or operations incident thereto, conducted
or carried on under or by virtue of the conditions
prescribed for this district and by written determi-
nation by the Administrator as provided in Subsection
H of Section 13.01 of the Los Angeles Municipal Code.
The policy of insurance issued pursuant hereto shall
be subject to the approval of the City Attorney and
duplicates shall be furnished to him. Each such policy
shall be conditioned or endorsed to cover such agents,
lessees, or representatives of the owner, lessee or
permittee as may actually conduct drilling, production
or incidental operations permitted by such written de-
termination by the Administrator. A certificate of
insurance carrier and its address and a sworn statement
that such insurance will be maintained in full force
and effect, shall be furnished the Chief Zoning Ad-
ministrator before any permits are issued.

18.    That the surety bond in the sum of $5,000 required by
Condition No. 3 of the above-mentioned Subsection F
and Condition (g) under Section 13.01-E,2 of the Mu-
nicipal Code shall be approved by the City Attorney,
executed by both the applicants and any lessee who is
to do the actual oil drilling and filed with the Chief
Zoning Administrator before any permit is issued.

19.    The operator, after drilling each well to a depth of
approximately 2,000 ft., shall take an electric log of
the well to that depth, analyze the log and provide the
Department of Water and Power of the City of Los Angeles
with a copy of said log, together with its interpreta-
tion, showing aquifers and an estimate of the salinity
of all waters encountered. From the information so ob-
tained, a joint determination shall be made of the
required depth at which the surface casing shall be
cemented. Sufficient cement shall be used to reach
the ground surface behind the surface casing. On com-
pletion of the drilling program, another log shall be
taken and analyzed and, if necessary, additional steps
shall be taken to prevent the vertical movement of
brine into fresh water zones. In the event no commer-
cial production of oil is obtained, cement plugs shall
be used to protect all fresh water in abandonment of
the well. A conference between the operator and offi-
cials of the Department of Water and Power may waive
the requirement for a log on each well, if sufficient
subsurface data is obtained from previous logs to per-
mit it to carry out the purpose of this condition.

Z. A. CASE NO. 16926                                      Page 11

20. That the public water supply system on the property shall be protected against backflow where necessary in a manner acceptable to the Departments of Health and Water and Power and meeting the requirements of the Uniform Plumbing Code. Furthermore, representatives of the said Departments may enter upon the premises at any reasonable time for routine investigation of operations. Any necessary changes that may be ordered in operations and/or facilities shall be made within a reasonable time as determined by the investigator.

21. That the drilling site and approaches thereto shall at all times be kept in a clean, neat-appearing condition free from weeds and debris, other than necessary and incidental drilling equipment and supplies, and shall be effectively landscaped and maintained as required under various applicable conditions heretofore mentioned and in compliance with plans approved by the Chief Zoning Administrator. In this instance special attention shall be given to effective housekeeping so as to prevent any accumulation of oil, oil products, or oil-coated boards, materials, or equipment which might cause fumes or odors detrimental to the adjoining   hotel   . Furthermore, that upon completion of the drilling operations, all equipment and supplies, except that actually necessary in production work and as specified on plans for the installation of the various production facilities and devices, shall be removed from the property so that, as far as practicable, there be no evidence above the ground of the presence of the oil producing facilities in the pits and cellars heretofore specified.

22. That if oil drilling and production is successful on the subject property and there is any evidence that the production activities cause noticeable subsidence in the present elevation of the ground on the subject property or in the immediate vicinity, then the Chief Zoning Administrator, after consultation with recognized experts in connection with this problem, shall have authority to require corrective action, such as repressurizing the oil producing structure or the cessation of oil drilling and production.

23. That the Chief Zoning Administrator reserves the right to impose additional conditions or require corrective measures to be taken if he finds after actual observation or experience with drilling one or more of the wells on the subject property that additional conditions are necessary to afford greater protection to adjacent or surrounding property as intended by the provisions of Section 13.01 of the Municipal Code, as well as the conditions set forth in Ordinance No.124316.

Z. A. CASE NO. 16926                                Page 12

The applicants' attention is called to the fact that this deter-
mination is not a permit or license, and that any permits and
licenses required by law must be obtained from the proper public
agency.  Furthermore, that if any condition of this grant is
violated, or if the same be not complied with in every respect,
then the applicants or their successors in interest may be pro-
secuted for violating these conditions the same as for any
violation of the requirements contained in the Municipal Code.
If this property is subleased or assigned to another oil company
for drilling or production purposes, it is incumbent upon the
applicants to notify said sublessee or assignee of the terms
and conditions described above and that the sublessee or assignee
must assume all said conditions to the satisfaction of the Ad-
ministrator.  The Chief Zoning Administrator's determination
in this matter will become effective after an elapsed period
of ten (10) days from the date of this communication, unless
an appeal therefrom is filed with the Board of Zoning Adjustment.

                                    Very truly yours,

                                    HUBER E. SMUTZ
                                    Chief Zoning Administrator

HES:es

cc:  Director of Planning

     Petroleum Administrator

     Larry Newman
     Standard Oil Company

     Department of Health

     Department of Water and Power

     Public Utilities and Transportation
     ATTENTION:  Thomas V. Tarbet

     State Regional Water Pollution
       Control Board No. 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

# CITY OF LOS ANGELES

ROBERT JANOVICI
CHIEF ZONING ADMINISTRATOR
—
ASSOCIATE ZONING ADMINISTRATORS
DANIEL GREEN
ALBERT LANDINI
WILLIAM LILLENBERG
JOHN J. PARKER, JR.
JON PERICA
HORACE E. TRAMEL, JR.

CALIFORNIA



RICHARD J. RIORDAN
MAYOR

DEPARTMENT OF
**CITY PLANNING**
CON HOWE
DIRECTOR
—
FRANKLIN P. EBERHARD
DEPUTY DIRECTOR

**OFFICE OF
ZONING ADMINISTRATION**
221 NORTH FIGUEROA STREET
ROOM 1500
LOS ANGELES, CA 90012-2601
(213) 580-5495
Fax: (213) 580-5569

July 20, 1995

Richard Russell (A)
St. James Oil Corporation
14711 Bentley Circle
Tustin, CA  92680

James J. Crisp (R)
14549 Archwood Street
Van Nuys, CA  91405

Department of Building and Safety

CASE NO. ZA  16926(PAD)
MODIFICATION OF CONDITION NO. 11
155 West 14th Place
Central City Planning Area
Zone :  M2-4-0
D. M.:  123B205
C. D. :  9
CEQA :  CE 95-0567
Fish and Game:  Exempt
Legal Description:  Lots 6-10 of
subdivision of center portion
of Carr Tract; Lots D, E and 29
of subdivision of north portion
of Carr Tract; and Lot G of
Tract 1491

Pursuant to Section 13.01-H of the Los Angeles Municipal Code, I <u>APPROVE</u>:

modification of Condition No. 11 of extant Case No. ZA 16926 to permit the redrilling of one Class A oil well identified as LAU-FC5 involving Urbanized Oil Drilling District Nos. U-97, U-113, U-128 and U-129,

upon the following additional terms and conditions:

1.   The existing and proposed well corridor shall be in substantial conformance with the plot plan identified as "Exhibit A - July, 1995".

2.   All terms and conditions specified under Case No. ZA 16926 shall be complied with, except for Condition No. 11 which relates to hours of operation, and which is hereby waived for the time period necessary to redrill Class A oil well LAU-FC5.

3.   Drilling operations on the site may be conducted seven days per week on a 24-hour per day basis, including any nationally recognized holiday. The maximum number of drilling days shall not exceed 20; however, such days need not be consecutive.

## APPEAL PERIOD - EFFECTIVE DATE

THE ZONING ADMINISTRATOR'S DETERMINATION IN THIS MATTER WILL BECOME EFFECTIVE AFTER <u>AUGUST 4, 1995</u>, UNLESS AN APPEAL THEREFROM IS FILED WITH THE BOARD OF ZONING APPEALS.  IT IS

**AN EQUAL EMPLOYMENT OPPORTUNITY — AFFIRMATIVE ACTION EMPLOYER**   Recyclable and made from recycled waste.

STRONGLY ADVISED THAT APPEALS BE FILED <u>EARLY</u> DURING THE APPEAL PERIOD AND IN PERSON SO THAT IMPERFECTIONS/INCOMPLETENESS MAY BE CORRECTED BEFORE THE APPEAL PERIOD EXPIRES.    ANY APPEAL MUST BE FILED ON THE PRESCRIBED FORMS, ACCOMPANIED BY THE REQUIRED FEE AND RECEIVED AND RECEIPTED AT A PUBLIC OFFICE OF THE DEPARTMENT OF CITY PLANNING <u>ON OR BEFORE</u> THE ABOVE DATE OR THE APPEAL WILL NOT BE ACCEPTED.    SUCH OFFICES ARE LOCATED AT:

Los Angeles City Hall               6251 Van Nuys Boulevard
200 North Spring Street              First Floor
Room 460, Counter S                 Van Nuys, CA  91401
Los Angeles, CA  90012              (818) 756-8596
(213) 485-7826

## NOTICE

THE APPLICANT IS FURTHER ADVISED THAT ALL SUBSEQUENT CONTACT WITH THIS OFFICE REGARDING THIS DETERMINATION MUST BE WITH THE ZONING ADMINISTRATOR WHO ACTED ON THE CASE.    THIS WOULD INCLUDE CLARIFICATION, VERIFICATION OF CONDITION COMPLIANCE AND PLANS OR BUILDING PERMIT APPLICATIONS, ETC., AND SHALL BE ACCOMPLISHED <u>BY APPOINTMENT ONLY</u>, IN ORDER TO ASSURE THAT YOU RECEIVE SERVICE WITH A MINIMUM AMOUNT OF WAITING.    YOU SHOULD ADVISE ANY CONSULTANT REPRESENTING YOU OF THIS REQUIREMENT AS WELL.

## FINDINGS OF FACT

After thorough consideration of the statements contained in the application, all of which are by reference made a part hereof, as well as knowledge of the property and the surrounding district, I find as follows:

1.    The subject property is a level, rectangular-shaped parcel of land located on the northeast side of 14th Place between Broadway and Hill Street.    The property occupies the entire block frontage along the northeast side of 14th Place siding on the northwest side of Broadway and the southeast side of Hill Street for a uniform distance of approximately 155 feet back to an improved alley.    The property is classified in the M2-4-O Zone and developed as a controlled drill site identified as the "Broadway Drill Site" which is enclosed with a masonry wall.    The drill site is located in Urbanized Oil Drilling District U-97 as established by Ordinance No. 124,316.

A review of information attached to the file indicated that oil drilling and inspection activities have been undertaken on the involved drill site since 1964 in accordance with the terms and conditions of ZA Case No. 16926 and subsequent cases, with the last case of record being ZA Case No. 21148, dated March 12, 1973, which permitted the redrilling of four oil wells and the move-on and daytime operation of partially soundproofed drilling type equipment for the redrill of said wells. Further, various plot plan approvals have been approved for redrilling and other activities to the present time.

CASE NO. ZA 16°°°(PAD)                                                          PAGE 3

2.   Currently, it is the intention of the applicant to redrill Class A oil
     well LAU-FC5 as bottomed in Urbanized Oil Drilling District No. U-113.
     It is for this purpose that the plot plan has been filed requesting that
     terms and conditions controlling drilling and production operations be
     established.

     The redrilling of the involved well is appropriate.   There is no
     evidence that the "Broadway Drill Site" has not been operated in
     accordance with all conditions imposed under previous grants and it is a
     normal and necessary function of petroleum operations to redrill from
     established drill sites in order to find and extract additional
     reserves.   Said redrilling will be accomplished with a diesel-electric
     drilling rig which will be soundproofed and painted; and, the proposed
     redrilling is scheduled to take approximately 20 days to complete.   No
     conflicts with normal production activities or adverse impacts on
     adjacent properties and improvements have been identified; and, upon
     completion of the redrilling operation, production activities will be
     resumed under the terms and conditions of existing authorizations.

JOHN J. PARKER, JR.
Associate Zoning Administrator

JJP:lmc

cc:   Councilmember Rita Walters
         Ninth District
      Adjoining Property Owners
      County Assessor
      Department of Water and Power
      Fire Department, Bureau of Fire
         Prevention and Public Safety
      City Administrative Officer

St. James Oil Corporation/R.C. Russell

St. James Oil Corporation/R.C. Russell

St. James Oil Corporation/R.C. Russell

**ARGAMAN, DAVID & RACHEL
RUBIN, ISRAEL & STACY**
1240 S. Hill Street
Los Angeles, California  90015

St. James Oil Corporation/R.C. Russell

**YUM, YUNG & SINJA**
152 W. Pico Boulevard
Los Angeles, California  90015

St. James Oil Corporation/R.C. Russell

**HAIMS, JUDITH L./JUDSON A./JEFFREY L.**
224 S. Mansfield Avenue
Los Angeles, California  90036

St. James Oil Corporation/R.C. Russell

**STANDARD BRANDS PAINT COMPANY**
4300 W. 190th Street
Torrance, California  90504

St. James Oil Corporation/R.C. Russell

**FULTHEIM, GARY, LEON
LEON FULTHEIM FAMILY TRUST 7-15-94**
975 Woodstock Lane
Ventura, California  93001

St. James Oil Corporation/R.C. Russell

**BLAU, BELA & MARIANA R.
BELA & MARIANA BLAU FAMILY TRUST**
1330 S. Broadway
Los Angeles, California  90015

St. James Oil Corporation/R.C. Russell

**TARICA, MORRIS N. AMADO, BERNICE E.
AMADO, ELLEN E. CO-TR OF THE AMADO
TRUST AGMT DATED 9-22-82**
203 S. Citrus Avenue
Los Angeles, California  90036

St. James Oil Corporation/R.C. Russell

**MAA'S HOLDING INC.
ATTN: KISHIN LALWANI**
1360 S. Broadway, Suite B
Los Angeles, California  90015

St. James Oil Corporation/R.C. Russell

**CHERNOFF, FRANCINE (TR)**
726 N. Rodeo Drive
Beverly Hills, California  90210

St. James Oil Corporation/R.C. Russell

**CHOI, JONG WON & UN BONG**
624 N. Bedford Drive
Beverly Hills, California  90210

St. James Oil Corporation/R.C. Russell

**ALLEN, STEVEN, TRACI / ALLEN, EDWARD
& MYRNA / FELTER, EDDY & ANNIE**
1600 S. Main Street
Los Angeles, California  90015

St. James Oil Corporation/R.C. Russell

**PICO-BLUE PROPERTIES
C/O KAREN SEONG WON PARK**
1311 S. Hill Street
Los Angeles, California  90015

St. James Oil Corporation/R.C. Russell

**LISABELLA, INC.**
8383 Wilshire Boulevard
Beverly Hills, California  90211

St. James Oil Corporation/R.C. Russell

**WASSERMAN, STEVE K. & LINDA S. (TRS)
WASSERMAN FAMILY TRUST /
WASSERMAN ESTHER**
4448 Westchester Drive
Woodland Hills, California  91364

St. James Oil Corporation/R.C. Russell

**TRANSAMERICA OCCIDENTAL LIFE INS.
C/O MORTGAGE LOAN DIV. RE 1427**
P.O. Box 2101 Terminal Annex
Los Angeles, California  90051

St. James Oil Corporation/R.C. Russell

**WHITE, VIRGINIA (TR)
ELIZABETH WHITE TRUST**
6160 Glen Holly
Los Angeles, California  90068

St. James Oil Corporation/R.C. Russell

**WHITE, VIRGINIA**
6160 Glen Holly
Los Angeles, California  90068

No Skipped Labels

**WHITE, MARY**
P.O. Box 51390
Phoenix, Arizona  85076

No Skipped Labels

**WHITE, PAULINE**
8901 Dakota
Garden Grove, California  92664

No Skipped Labels

No Skipped Labels

No Skipped Labels

No Skipped Labels

No Skipped Labels

No Skipped Labels

No Skipped Labels

No Skipped Labels

No Skipped Labels

ZA 169 26 (PLA)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D



**Kevin de León**
Councilmember, Fourteenth District

Office of The Chief Zoning Administrator
Department of City Planning
City Hall, 200 N Spring St,
Los Angeles, CA 90012

March, 8, 2022

**RE:     ZA-1964-16926-O January 31, 1964**

Dear Chief Zoning Administrator Malian,

The Broadway Drill Site, owned and operated by Nasco Petroleum LLC ("Nasco"), is located at 155 West 14th Place and 1325 South Broadway, Los Angeles, CA 90015.

It is my understanding that the Office of the Zoning Administrator has the authority to call oil operators in for a compliance review. This drill site has been extracting oil since January 1964 at the current location and the City's Petroleum Administrator, in a recent report, identified the drill site as being located in a census tract with a pollution burden and environmental vulnerability in the 95% percentile.

Within close proximity to the Nasco site are the following residential buildings, containing residents who are my constituents:

- The Portsmouth Hotel - 1308 S Hill St; 53 units, a listed residential hotel which is a housing type specifically protected by the City of Los Angeles as a limited housing resource which must be conserved.
- Gateways Normandie Village East Residential Facility/Walden House- 1355 S Hill St: units unknown, which provides "... mental health services and housing for adults ages 18-59 who are ready for discharge from institutions... and in need of a safe place to live. Clients receive mental health supportive services in order to go into a stable community placement."
- La Primavera Apartments 1330 S Olive St:  35 low-income apartments.
- Casa Loma LA Apartments- 208 W 14th St :57 apartment units
- Wren - 1230 S Olive St: 362 apartment units
- Axis on Twelfth- 1200 S Broadway: 391 apartment units

My office has seen copies of reports from the State Of California Natural Resources Agency Department Of Conservation Geologic Energy Management Division ("Cal GEM") which were also shared with the Planning Department and the City's Petroleum administrator which suggest that this site has a troubling pattern of operating outside of legal requirements which has the real potential of putting the health of hundreds of my constituents at grave and immediate risk.

The most troubling of these reports dates to August 2021 when Cal GEM staff detected elevated methane concentrations over the facility and required that Nasco Petroleum, L.L.C. immediately investigate the elevated methane levels and provide investigation, mitigation, repair, and test results, if any, to Cal GEM for review by September 6, 2021. As far as I am aware no such investigation reports have been shared with Cal GEM or the City. Nor has a root cause analysis been undertaken.

Given this information I am extremely worried that not only has methane been leaking off this site in the past but that it may still be leaking.

Even earlier in the Spring of 2021, Cal GEM reports that Nasco injected above maximum allowable surface injection pressure into the Wells and was required to shut down operations and pay a fine of one million four hundred forty-nine thousand dollars, noting that this action took place "in an urban environmentally sensitive area because it is within 300 feet of a building intended for human occupancy." The report notes, "Nasco did not disconnect injection lines from the wellheads upon losing injection approval for the Wells."

Nasco also has failed to submit a required pipeline management plan in an environmentally sensitive area and has refused to allow a California Geologic Energy Management Division (CalGEM) field engineer access to conduct inspections of Nasco's regulated oil and gas well facilities.

At this point in time this operator has chosen more than once to refuse to comply with standard regulations, putting their workers and nearby residents at unnecessary risk, and to actively interfere with official attempts to investigate and assess the impacts.

The City's permit to Nasco issued in 1964 states that: "all features of oil drilling and production must be strictly controlled to eliminate any possible odor, noise, vibrations, hazards, unsightliness, and truck traffic." The same authorization has a condition of approval "that the drilling of the oil wells shall be conducted in compliance with good oil field practice…"

The Office of the Chief Zoning Administrator has, "the right to impose additional conditions or require corrective measures to be taken if he finds that additional conditions are necessary to afford greater protection to the adjacent or surrounding property." The approval letter also notes, "if any condition of this grant is violated, or if the same be not complied with in every respect than the applicants or their successors in interest may be prosecuted for violating these conditions."

As you know well, it is the duty of the City's zoning authorities to protect the public peace, health and safety from any land use which becomes a nuisance and or adversely affects the health, peace or safety of persons residing or working in the surrounding area. At this point all information available to decision makers points to the operator at 155 West 14th Place and 1325 South Broadway as being reckless and negligent of public safety to a level that warrants the initiation of a revocation process, and may indicate the need for further investigation of potential violations of civil and criminal statutes. I therefore ask that you begin any processes necessary to swiftly correct this issue and protect the residents and workers of Council District 14.

Thank you for your prompt attention to this urgent issue.


Sincerely,


**KEVIN DE LEÓN**
*Councilmember 14th District*
*Los Angeles City Council*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT E

**CS** Casso&Sparks, LLP

ATTORNEYS AT LAW

13300 Crossroads Parkway North, Suite 410
City of Industry, CA 91746

Christopher K. Spiers
Of Counsel
cspiers@cassosparks.com

July 6, 2021

**VIA Email**

Office of Kevin De Leon
Council District 14
200 N Spring Street, Suite 425
Los Angeles, CA 90012
councilmember.kevindeleon@lacity.org

Re: *California Records Act Request (Government Code §§ 6250, et seq.)*

Dear Sir or Madam:

Pursuant to the California Public Records Act, Government Code §§ 6250, et seq. (the "**Act**"), we hereby request copies of the following described "public records," as defined in Government Code § 6252(g), in the possession, custody or control of the Fourteenth Council District of Los Angeles, Council Member Kevin de Leon, or any officers, employees, or managers thereof (collectively, the "**Council District 14**"). Specifically, we request copies of the following "writings," as that term is defined by the Public Records Act, Government Code § 6252(g):

1. All writings relating or referring to Nasco Petroleum LLC, or any officers, employees, or managers thereof (collectively "**Nasco**").

2. All writings relating or referring to St. James Oil Company or any of its officers, employees, or managers thereof (collectively "**St. James**").

3. All writings relating or referring to the oil and gas production wells and water injection/disposal wells located on the property at 1325 S. Broadway, Los Angeles, California known as the St. James Drill Site (the "**St. James Drill Site**").

4. All writings containing or referring to any communications between Council District 14 and the Los Angeles City Department of Public Works, its Office of Petroleum and Natural Gas Administration and Safety, the Administrator of the Office of Petroleum and Natural Gas Administration and Safety, or any employees or managers thereof, that relate or refer to Nasco, St. James, or the St. James Drill Site and dated from January 1, 2011 to the present.

5. All writings relating or referring to the operation of the following injection and disposal wells by Nasco or any prior operator of the following wells:

   a. LA Unit #2 Well (API 03720077);

1

      b.  LA Unit # 9 Well (API 03700458);

      c.  LA Unit #10 Well (API 03720175); and

      d.  LA Unit Venice # 1 Well (API 03700467) (collectively, the "**Injection Wells**").

6.     All writings relating or referring any investigatory reports made by or on behalf of the City of Los Angeles or any other persons regarding the Injection Wells.

7.     All writings relating or referring any investigatory reports made by or on behalf of the City of Los Angeles or any other persons that relate or refer to Nasco, St. James or the St. James Drill Site and dated from January 1, 2011 to the present.

8.     All writings containing or referring to any communications between Council District 14 and the Los Angeles City Planning Department, or any employees, or managers thereof, that relate or refer to Nasco, St. James, or the St. James Drill Site and dated from January 1, 2011 to the present.

9.     All photographs or digital depictions of the St. James Drill Site.

10.    All writings that relate or refer to any land use or zoning permits or entitlements from the City of Los Angeles relating to the St. James Drill Site.

11.    All writings relating or referring to any meetings between any employee of the City of Los Angeles at which Nasco or the St. James Drill Site was discussed, including, but not limited to, any agendas, notes, or summaries of those meetings.

12.    All writings that relate or refer to any franchises held by Nasco or relating to the St. James Drill Site.

13.    All writings containing or referring to any communications between Council District 14 and the Los Angeles City Department of Public Works, its Office of Petroleum and Natural Gas Administration and Safety, the Administrator of the Office of Petroleum and Natural Gas Administration and Safety, or any employees, or managers thereof, that relate or refer to any inspection or investigation of the St. James Drill Site and dated from January 1, 2011 to the present.

14.    All writings relating or concerning any surveillance or inspection of the St. James Drill Site, including any inspection reports and any communications with any person concerning such inspection.

15.    All notices of violations regarding the St. James Drill Site, Nasco or St. James.

16.    All writings containing or referring to any communications between Council District 14 and Jessica Brown, an attorney in the Environmental Justice Unit of the City Attorney's Office that relate or refer to Nasco, St. James or the St. James Drill Site and dated January 1, 2011 to the present.

17.    All writings containing or referring to any communications between Council District

14 and the California Department of Conservation, its Geologic Energy Management Division ("CalGEM"), its predecessor (the Division of Oil, Gas, and Geothermal Resources or "DOGGR"), the State Oil and Gas Supervisor, or any officers, employees, or managers thereof that relate or refer to Nasco, St. James, or the St. James Drill Site and dated January 1, 2011 to the present.

18.    All writings relating or referring to a June 29, 2021 letter from State Oil and Gas Supervisor, Uduak-Joe Ntuk, to Nasco.

19.    All writings containing or referring to any communications between Council District 14 and the Los Angeles City Attorney's Office, or any employees, or staff thereof that relate or refer to Nasco, St. James or the St. James Drill Site and dated January 1, 2011 to the present.

20.    All writings evidencing or concerning any communications between Council District 14 and the Regional Water Quality Control Board-Los Angeles Region or the State Water Resources Control Board regarding Nasco or the operation of oil and gas wells and the Injection Wells at the St. James Drill Site.

21.    All writings evidencing or concerning any communications between Council District 14 and the South Coast Air Quality Management District or the California Air Resources Board regarding Nasco or the operation of oil and gas wells and the Injection Wells at the St. James Drill Site.

22.    All writings evidencing or concerning any communications between Council District 14 and the U.S. Environmental Protection Agency regarding Nasco or the operation of oil and gas wells and/or the Injection Wells at the St. James Drill Site.

23.    All writings containing or referring to any communications between Council District 14 and the California Senate Committee on Natural Resources, California State Senator Henry Stern, or any officers, employees, or managers thereof that relate or refer to Nasco, St. James or the St. James Drill Site and dated January 1, 2011 to the present.

24.    All writings evidencing or concerning any communications between Council District 14 and any association or other non-governmental organization, including STAND-LA and Eric Romann, regarding Nasco or the operation of oil and gas wells or Injection Wells at the St. James Drill Site.

25.    All writings containing or referring to any communications between Council District 14 and the Nant Capital, LLC, its subsidiary the Los Angeles Times, or any officers, employees, or managers thereof (collectively, "the LA Times"), that relate or refer to Nasco, St. James or the St. James Drill Site and dated January 1, 2011 to the present.

26.    All writings relating or referring to the article published by the LA Times on April 20, 2021 entitled "Inspections lag for hundreds of active oil wells in L.A."

27.    All writings containing or referring to any communications between Council District

14 and the Gannett Publications, its subsidiary the Desert Sun, Janet Wilson, or any officers, employees, or managers thereof (collectively "the **Desert Sun**"), that relate or refer to Nasco, St. James or the St. James Drill Site and dated January 1, 2011 to the present.

28.    All writings relating or referring to the article published by the Desert Sun on March 22, 2021 entitled "Are California oil companies complying with the law? Even regulators often don't know."

29.    All writings containing or referring to any communications between Council District 14 and ProPublica, or any officers, employees, or managers thereof (collectively "**ProPublica**"), that relate or refer to Nasco, St. James or the St. James Drill Site and dated January 1, 2011 to the present.

30.    All writings relating or referring to the article published by the Desert Sun on May 28, 2021 entitled "South LA oil producer fined $1.5 million after Desert Sun, ProPublica probe."

This request includes any and all "writings" as defined under Section 6252(g) of the Act. Writings shall also include text messages and emails sent or received on personal accounts of all Council District 14 officials and employees, including text messages and emails of Council District 14 representatives. (*See City of San Jose v. Superior Court* (2017) 2 Cal.5th 608.)

We are prepared to pay any necessary copying charges that Council District 14 may be permitted to request under the Act for the requested documents. Please advise us of the estimated costs and we will promptly send a check.

Please respond to the undersigned by within ten (10) days of your receipt of this letter, as provided in Government Code § 6253(c), either by providing all the requested writings or by providing a written response setting forth the legal authority for withholding or redacting any document and stating when the documents will be made available.

In your response, please provide entire documents, even if only parts of them are responsive to this request, and, if specific portions of any documents are exempt from disclosure, please provide the non-exempt portions.

If you maintain writings or data in electronic format, please provide them in that same format. If you are unable to reproduce electronic writings in electronic form, please provide a reason for doing so.

Please feel free to contact me if you have any questions regarding this request for public records.

Sincerely,

/s/ *Christopher K. Spiers*

Christopher K. Spiers

cc:  Nasco Petroleum LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT F



# Nasco Petroleum, L.L.C.

July 28, 2022

**Via E-Mail and U.S. Mail**

Councilmember Kevin de Leon
Fourteenth District
City Hall, 200 N. Spring Street, Room 425
Los Angeles, CA 90012

Re: March 8, 2022 Letter to Chief Zoning Administrator re ZA-1964-16926-O

Honorable Councilmember de Leon:

We recently received a copy of the March 8, 2022 letter which your office sent under your signature to the Office of the Chief Zoning Administrator regarding the Broadway Drill Site that our company operates in your district at 1325 S. Broadway in Downtown Los Angeles.  While your letter is dated March 8, we did not receive the letter until June 22, 2022—nearly three months later.

We appreciate the concern expressed in your letter for the health, safety and economic well-being of your constituents, as well as your longstanding commitment to protecting our environment. We share those concerns. Nasco does its best to be a good neighbor and to ensure that our oil and gas production operations are conducted in full compliance with all applicable laws and regulations. Nasco has spent hundreds of thousands of dollars over the last year upgrading our operations and facilities and working closely with state and local regulatory agencies to meet  that objective.

Considering your concern about public safety and the environment, one would reasonably expect that your office would have, at least, performed a minimal amount of investigation into your claims *before* sending a letter accusing a small, local minority-owned business of illegal activity and demanding that the Zoning Administrator initiate a permit revocation process of some type. Under these circumstances, we were very disappointed that neither you nor your staff reached out to us in any way to discuss the various accusations in your letter before you sent it to the Zoning Administrator. Had such an effort been made, we would have been able to explain our oil

1

and gas production operations in detail and very clearly demonstrate to you that Nasco is fully
complying with all laws and regulations applicable to our operations. That dialogue would have
avoided the many inaccurate statements and contentions in your March 8 letter before you sent it.
More importantly, once you had the actual facts, rather than a series of conjectures based on a
fundamental misunderstanding of the regulatory reports referenced in your letter, we are
confident that you would have been able to satisfy yourself that any concern regarding our
operations was completely unfounded.

We also have some serious questions about the source of the information that your staff appears
to have relied upon in making the statements in your letter. As you know, Nasco's attorneys
made a request to your office pursuant to California Public Records Act, Government Code §§
6250, et seq. on *July 6, 2021* ("Nasco's PRA Request", attached hereto as Exhibit A). Nasco's
PRA Request asked for all documents that were in your office's possession regarding each of the
issues raised in your March 8, 2022 Letter, including any documents concerning Nasco, the
Broadway Drill Site and Nasco's wells. After failing to respond to Nasco's PRA Request for
several months, your office produced only *four* documents on September 1, 2021.  (See
Councilmember's de Leon September 21, 2022 Email and Production, attached hereto). Those
four documents did not mention any of the issues raised in your recent March 8, 2022 Letter—
including the August 2021 alleged detection of elevated methane concentrations or issues related
to Nasco's injection practices.  Another very troubling fact is that it appears that your office may
have consciously withheld relevant documents and information from Nasco, despite the
obligations under the PRA.

Since your staff did not extend to Nasco the courtesy of an opportunity to respond to the matters
identified in your letter, and apparently, did not have any documents to support the claims set
forth in that letter, we believe that it is very important to both set the record straight and also to
try to provide you and the Zoning Administrator with accurate information that would satisfy any
legitimate concerns that either of you might have about our operations.

As to the specific substantive concerns set forth in your letter, you wrote "this site has a troubling
pattern of operating outside of legal requirements which has the real potential of putting the
health of hundreds of my constituents at grave and immediate risk."  That statement has no basis
in fact.  Nasco's current owners assumed operational control in 2021 and have worked tirelessly
since then to improve the efficiency of the operation at the Broadway Drill Site.  If there are any
documents upon which your staff relied in making this accusation, they were not provided in
response to our PRA request.  Based on that fact, we presume that there weren't any supporting
documents. Nevertheless, if your office has any supporting documents, we ask that you
immediately provide them to us in accordance with your obligations under the PRA.

Second, the March 8, 2022 Letter goes on to claim Nasco was the source of "elevated methane
concentrations" over the Broadway Drill Site in August 2021 and implies that Nasco took no
actions to address concerns of the State of California Natural Resources Agency Department of
Conservation Geologic Energy Management Division (or "CalGEM") about methane.  That
statement is also not correct. What actually happened was that Nasco immediately hired third-
party environmental service provider, Montrose Environmental, to determine the primary source

of the elevated methane levels. Based on the source investigation, we understand that the primary source of the methane was determined to be a construction site across the street from our facility. Once Montrose identified the source of the elevated methane levels, Montrose and Nasco took the steps necessary to immediately correct any issue and notified the construction site personnel and worked to prevent similar incidents. Montrose provided CalGEM with a detailed and comprehensive explanation of the remedial work on September 21, 2021. (See Montrose's September 6, 2021 correspondence with CalGEM attached hereto as Exhibit C.) Neither CalGEM nor any other regulatory agency took any action against Nasco regarding the incident.

Third, the March 8, 2022 Letter takes issue with CalGEM's May 26, 2021 Order No. 1198 ("Order No. 1198"). Specifically, you mention that CalGEM reported "Nasco injected above the maximum allowable surface injection pressure into the Wells and was required to shut down operations and pay a fine." You also imply that Nasco further violated the law by continuing to inject after CalGEM issued Order No. 1198. Again, had you and your office done any amount of research into these issues, you would have learned that your statements are incorrect.

Nasco has consistently operated its injection wells at a pressure that had been approved on multiple occasions by CalGEM. When CalGEM tried to unilaterally reduce Nasco's MASP by nearly 25% without any scientific support or justification or appropriate supporting technical data, Nasco objected. Following the issuance of Order No. 1198, Nasco filed an administrative appeal in which Nasco denied the truth of CalGEM's allegations in Order No. 1198. As you should be aware, Order No. 1198 was stayed by the appeal and California law allows operators to continue to operate while an appeal is pending. Accordingly, Nasco was *not* required to disconnect its injection lines as your letter asserts. Nasco is confident that Order No. 1198 will not survive scrutiny when its appeal is heard by an administrative law judge.

Finally, the letter incorrectly states that "Nasco has failed to submit a required pipeline management plan in an environmentally sensitive area." Again, a simple call or email to CalGEM and/or Nasco would have resolved any concerns on this question. As CalGEM will confirm, Nasco submitted a "pipeline management plan" or "PMP" in November 2021 and updated that PMP in January 2022- before you sent your letter. Again, you could have learned this information through one email or telephone call to CalGEM and/or Nasco. Furthermore, our wellsite is located in heavily industrialized location and could hardly be considered an "environmentally sensitive area" in the traditional sense of that term. The property is located in Oil Drilling District U-91 which was established by Ordinance No. 124,316 in 1963 and oil and gas production operations have occurred at this site and in this area for the last 60 years. Nevertheless, Nasco conducts all of its operations in an environmentally sensitive manner, consistent with applicable environmental laws, rules and regulations.

None of the issues raised by CalGEM since 2018 concern any actual threats to the structural integrity of Nasco's wells or the environment. Instead, they dealt with routine reporting and testing delays that were largely attributable to Nasco's internal turnover and/or the COVID-19 pandemic- hardly "a pattern of operating outside legal requirements which has the real potential of putting the health of hundreds of my constituents at grave and immediate risk." If you are aware of any study or report that actually support your contentions we would appreciate it if you

could provide them to us immediately. Otherwise, we can only assume that there are no such reports to support your statements.

As to the 1964 permit from the City of Los Angeles which you reference at page 2 of your letter, we note that the permit itself was not produced in response to our PRA request. We expect your office to finally produce that document. You quote the following provisions of that permit in your letter:

> "The City's permit to Nasco issued in 1964 states that: 'all features of oil drilling and production must be strictly controlled to eliminate any possible odor, noise, vibrations, hazards, unsightliness, and truck traffic.' The same authorization has a condition of approval 'that the drilling of the oil wells shall be conducted in compliance with good oil field practice... '

We can assure you that Nasco strictly controls its operations in a manner "to eliminate any possible odor, noise, vibrations, hazards, unsightliness, and truck traffic and in compliance with good oilfield practices" in Southern California. If you have any information or documents that that would support a contrary contention, they should have already been produced in response to our PRA Request.

You also made the following contention in your letter:

> "The Office of the Chief Zoning Administrator has, 'the right to impose additional conditions or require corrective measures to be taken if he finds that additional conditions are necessary to afford greater protection to the adjacent or surrounding property.' The approval letter also notes, 'if any condition of this grant is violated, or if the same be not complied with in every respect than the applicants or their successors in interest may be prosecuted for violating these conditions.'."

Again, if your office is aware of any documents that would support any argument that additional measures or corrective actions are necessary or which would serve a basis for a prosecution for violating any conditions, those documents should have been provided to us last year. Since none were produced by your office, or for that matter, by the Zoning Administrator in response to our separate PRA request to that office, we assume that there are no such documents.

Since it appears that your office withheld documents in responding to Nasco's PRA Request and failed to comply with its obligations under the California Public Records Act, we will be sending additional requests to your office, as well as to the Zoning Administrator, to obtain any withheld records. We certainly hope that we will receive a response that complies with the PRA this time.

Again, we share your concerns about conducting our operations safely and in a manner that is sensitive to the environment and the community in which we are located. As you know, our Broadway Drill Site is located in an area which, while it may be in transition, is still economically challenged. In your June 15, 2021 letter to the Planning Commission regarding the Downtown Los Angeles Community Plan Update, "DTLA 2040", you mentioned the impact of the economic storm of COVID-19 on business located in this area. You also mention that you "have serious concerns that blue collar jobs and businesses …. may be pushed out."  We share

that concern. Nasco is one of those businesses which was adversely impacted by the pandemic. But through hard work and the sacrifices of our employees, we have managed to keep our company going and preserve their jobs. In this context, your demand that the Zoning Administrator take steps to put a small, minority-owned company out of business seems counterintuitive to us.

Despite the jobs that our company provides, as well as our critical role in providing fuel that your constituents need to commute to their jobs Downtown and throughout Los Angeles, your letter also appears to reflect an underlying bias against oil and gas production facilities and producers. As you know from your time in the California Legislature, California oil production facilities are the safest and most strictly regulated operations in the world. California has been blessed with tremendous oil reserves which have provided the fuel for the great economic engines that the state and the City of Los Angeles have become.

While our state transitions to other forms of energy, our residents and our economy depend on the oil that Nasco and other operators produce here in California. Despite the fact that California producers like Nasco produce some of the "greenest" oil in the world, the primary effect of knee jerk efforts to shut down producers like Nasco would be to increase the State's dependence on crude oil imported from other countries which do not have the same environmental practices as California. Based on data from the Energy Information Administration, approximately 70% of the state's crude supply is now imported into our crowded ports, inevitably increasing the pollution resulting from that shipping. Ecuador is now California's largest source of foreign crude and half of Ecuador's oil production is exported to California. (See, https://www.nbcnews.com/investigations/crude-reality-one-us-state-concumes-half-il-amazon-rainforest-rcna7284)

Efforts to force California producers like Nasco out of business will only exacerbate the resulting environmental impact on the country and globally. Ecuador is destroying the Amazon rain forest and displacing indigenous people to expand its oil production. Similarly, California imported 18 million barrels of crude oil from Russia in 2021. So, it is critical to confront the reality that efforts to curtail in-state oil production operations inevitably leads to the import of oil from places like Ecuador's Rain Forest, Saudi Arabia, and until recently, outlaw states such as Russia.

In light of the above, Nasco thinks that the best way to address your concerns and to ensure that you are fully informed about our business would be through and open and honest dialogue. Accordingly, we would appreciate the opportunity to meet with you and members of your office. We are confident that we can fully address and allay any concerns with the additional studies, data, and compliance work that Nasco has undertaken since Order No. 1198 was issued over a year ago.

We hope that you will accept Nasco's invitation to meet.  If so, please provide the earliest dates
and times that are amenable for you and your team.


Very truly yours,


Amit Yonay/Joseph Bashoo

Owner/Manager

cc:  Chief Zoning Administrator


4869-3754-4748, v. 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT G

OFFICE OF ZONING ADMINISTRATION
200 N. SPRING STREET, ROOM 763
LOS ANGELES, CA 90012-4801
(213) 978-1318

**ESTINEH MAILIAN**
CHIEF ZONING ADMINISTRATOR

**ASSOCIATE ZONING ADMINISTRATORS**
JACK CHIANG
HENRY CHU
JONATHAN A. HERSHEY, AICP
THEODORE L. IRVING, AICP
CHARLES J. RAUSCH JR.
CHRISTINA TOY LEE

**CITY OF LOS ANGELES**
CALIFORNIA



ERIC GARCETTI
MAYOR

LOS ANGELES DEPARTMENT
OF CITY PLANNING
EXECUTIVE OFFICES

VINCENT P. BERTONI, AICP
DIRECTOR

SHANA M.M. BONSTIN
DEPUTY DIRECTOR

ARTHI L. VARMA, AICP
DEPUTY DIRECTOR

LISA M. WEBBER, AICP
DEPUTY DIRECTOR

planning.lacity.org

September 9, 2022

Nasco Petroleum, LLC (Op)
ATTN: Amit Yonay, Agent
1325 South Broadway
Los Angeles, CA 90015

**CASE NO**. ZA 16926(PAD)
**LETTER OF COMMUNICATION**
155 West 14th Place, 1325 South Broadway
Central City Community Plan Area
**ZONE:** C2-2D-O
**D.M. :** 124-5A207
**CD:** 14 – De León
**Legal Description:** Lots 6-10 of Subdivision of Center Portion of Carr Tract; Lots D, E and 29 of Subdivision of North Portion of Carr Tract; and Lot C of Tract 1491

The Department of City Planning is requiring the filing of a Plan Approval application for a review of compliance with the conditions imposed under ZA 16926(PAD) for the property located at 1325 South Broadway. The purpose of this Plan Approval is to review the operator's compliance with, and the effectiveness of, the conditions established in the subject grant.

Background

The property is located on a level, rectangular-shaped parcel of land located on the northeast side of 14th Place between Broadway and Hill Street. The subject parcel occupies the entire block frontage along the northeast side of 14th and also on the northwest side of Broadway and the Southeast side of Hill Street between 14th street and the adjacent alleyway. The property's zoning is C2-2D-O and is developed as an oil drilling and production site, identified as the "Broadway Drill Site" (Drill Site) which is enclosed within a fenced wall. The Drill Site is located in Urbanized Oil Drilling District U-97 as established by Ordinance No. 124,316, which is located in the Downtown Los Angeles Oil Field as identified by the California Geologic Energy Management Division

CASE NO. ZA-16926(PAD)

(CalGEM). It is the only oil drilling and production facility active in this oil field.

The Drill Site was first approved for oil extraction and production on January 31, 1964, in Case No. ZA 16926. The most recent approval granted to the Drill Site is ZA 16926(PAD), dated July 20, 1995, in which the Zoning Administrator approved a modification of Condition No. 11 of Case No. ZA 16926 to permit the redrilling of one Class A oil well identified as LAU-FC5 involving Urbanized Oil Drilling District Nos. U-97, U-113, U-128, and U-129.

Recent Drill Site Activities

The Drill Site operation is subject to the Conditions of Approval imposed by ZA 16926, ZA 16926(PAD), and corresponding conditions in Los Angeles Municipal Code Sections 13.01. See **Attachment "A"** for a copy of the original 1964 determination and **Attachment "B"** for a copy of the subsequent 1995 Plan Approval Determination.

The Department of City Planning has learned that the operator has received several Notices of Violations, Notices to Comply, and compliance letters issued by multiple regulatory agencies including CalGEM, the South Coast Air Quality Management District, the Los Angeles Fire Department Certified Unified Program Agency, and the Los Angeles County Fire Department Health Hazardous Materials Division. These notices encompass compliance issues related to odors, fugitive emissions, methane leaks, failure to report emissions data, and the use of microturbines at the Drill Site. See **Attachment "C"** for copies of the notices and orders

The orders and notices raise clear issues that merit greater attention to the Drill Site's operations. For example, per LAMC Section 13.01-F.43, the Drill Site does permit the onsite generation of electricity. Thus, the use of microturbines would violate Condition No. 2 of Case No. ZA 16926(PAD), which requires compliance with Condition No. 1 of Case No. ZA 16926, which in turn requires compliance with Los Angeles Municipal Code (LAMC) Section 13.01-F.43:

43. *That drilling, pumping and other power operations shall at all times be carried on only by electrical power and that such power shall not be generated on the controlled drilling site or in the district.*

Also, the Drill Site's operations must be kept in good operating condition and management such that it does not result in nuisance issues to the local community, as required by Condition No. 1 of Case No. ZA 16926, which in turn necessitates compliance with LAMC Section 13.01-F.18:

18. *That all production equipment used shall be so constructed and operated that no noise, vibration, dust, odor or other harmful or annoying substances or effect which can be eliminated or diminished by the use of greater care shall ever be permitted to result from production operations carried on at*

Page **2** of **5**

CASE NO. ZA-16926(PAD)

*any drilling site or from anything incident thereto to the injury or annoyance of persons living in the vicinity; nor shall the site or structures thereon be permitted to become dilapidated, unsightly or unsafe. Proven technological improvements in methods of production shall be adopted as they, from time to time, become available if capable of reducing factors of nuisance or annoyance.*

The record of noncompliance, as documented by various regulatory agencies (**Attachment "C"**), illustrates that the Drill Site's operations are in violation of LAMC Section 13.01-F.43 and potentially in violation of other standards enumerated under LAMC Section 13.01 -F.18. For quicker reference, **Attachment "D"** provides a summarized chart of the Drill Site's noncompliance record. The Office of Zoning Administration is hereby requiring specific actions from the Drill Site operator, as specified below.

Instructions to Drill Site Operator

Pursuant to the authority outlined in Condition No. 23 referenced below, the Office of the Zoning Administration of the Department of City Planning is requiring the filing of a Plan Approval application for purposes of a review of compliance with the conditions imposed under ZA 16926 and 16926(PAD).

Condition 23 of Case No. ZA 16926 provides that the Zoning Administrator may impose additional corrective measures to the subject property's use:

*Condition No. 23. "That the Chief Zoning Administrator reserves the right to impose additional conditions or require corrective measures to be taken if they find after actual observation or experience with drilling one or more of the wells on the subject property that additional conditions are necessary to afford greater protection to adjacent or surrounding property intended by the provisions of Section 13.01 of the Municipal Code, as well as the conditions set forth in Ordinance No. 124316."*

The Department of City Planning also retains the right pursuant to Los Angeles Municipal Code 12.27.1-B to require the modification or discontinuance of any previously issued discretionary zoning approval if it is found that the use as operated or maintained creates a public nuisance, adversely impacts nearby uses, and/or jeopardizes or adversely affects the public health in the surrounding area. Section 12.27.1-B allows the Department of City Planning to modify, discontinue or revoke any previously issued discretionary approvals *"if it is found that the land use or discretionary zoning approval as operated or maintained:*

*1. Jeopardizes or adversely affects the public health, peace, or safety of persons residing or working on the premises or in the surrounding area; or*

CASE NO. ZA-16926(PAD)

2.  *Constitutes a public nuisance; or*

3.  *Has resulted in repeated nuisance activities, ….; or*

4.  *Adversely impacts nearby uses; or*

5.  *Violates any provision of this chapter; or any other city, state, or federal regulation, ordinance, or statute; or*

6.  *Violates any condition imposed by a prior discretionary land use approval… ."*

No later than 30 calendar days of this dated letter, the operator shall make initial contact with the Office of Zoning Administration to coordinate the filing of the Plan Approval application. No later than 90 calendar days of this dated letter, the Plan Approval application and, if necessary, the associated environmental clearance application shall be filed by the applicant on the appropriate forms as directed by ZA Memorandum No. 133. See **Attachment "E"** for a copy of the memorandum. This application must be accompanied by the payment of all requisite fees, as governed by Section 19.01 of the LAMC.

Please note that any separate actions taken by other City agencies or responsible agencies does not relieve the operator of the requirement to fulfill the terms of the subject grant, ZA 16926(PAD).

If you have questions regarding this matter, please direct initial contact to Edber Macedo, City Planner, Office of Zoning Administration, at (213) 978-1198 or e-mail at: edber.macedo@lacity.org.

ESTINEH MAILIAN
Chief Zoning Administrator

EM:VS:ecm

Cc:    Councilmember De Leon, Fourteenth District
       Eric Blyther, Office of Petroleum and Natural Gas Administration and Safety
       Captain Lawrence Salas, Los Angeles Fire Department – Oil Wells Unit
       Royce Long, Los Angeles Fire Department – CUPA Unit
       Catherine Nuezca-Gaba, Los Angeles Department of Building and Safety
       Jennifer Tobkin, Office of the City Attorney
       Uduak Ntuk-Joe, California Geologic Energy Management Division
       Terrence Mann, South Coast Air Quality Management Division
       Jeff Holwager, Los Angeles County Fire Department – HHMD

CASE NO. ZA-16926(PAD)

Attachments:

      Attachment A:

           Letter of Determination - ZA 16926

      Attachment B:

           Letter of Determination - ZA 16926(PAD)

      Attachment C:

           09/03/2019 – LACoFD HHMD Notice of Violation
           09/10/2020 – LAFD CUPA Notice of Violation
           03/30/2021 – CalGEM Notices of Violation
           05/26/2021 – CalGEM Compliance Order
           08/20/2021 – South Coast AQMD Notice of Violation
           08/23/2021 – CalGEM Notice of Methane Levels
           12/27/2021 – CalGEM Compliance Order
           02/15/2022 – South Coast AQMD Odor Complaint Records

**City Planning staff can email this document packet by request. Please
contact Edber Macedo at edber.macedo@lacity.org to obtain digital copies.**

      Attachment D:

           Noncompliance Chart for the Broadway Drill Site

      Attachment E:
           ZA Memo 133

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT H



John J. Harris
jharris@cassosparks.com
www.cassosparks.com

Casso&Sparks, LLP

ATTORNEYS AT LAW
13300 Crossroads Parkway North, Suite 410
City of Industry, CA  91746
Telephone: 626.269.2980

**VIA EMAIL AND U.S. MAIL**

October 7, 2022

Estineh Malian, Chief Zoning Administrator
Edber Macedo, City Planner
City of Los Angeles
Office Of Zoning Administration
200 N. Spring Street
Room 763
Los Angeles, CA 90012-4801

Re: <u>Case No. ZA 16926(PAD) -Letter Of Communication to Nasco Petroleum, LLC-155 West 14th Place, 1325 South Broadway, Los Angeles, CA</u>

Dear Ms. Malian and Mr. Macedo:

This firm represents Nasco Petroleum, LLC which has asked us to respond to your "Letter Of Communication" dated September 9, 2022 ("September 9 Letter") regarding Nasco's oil and gas production facility located at 155 West 14th Place and 1325 South Broadway in Downtown Los Angeles (the "Nasco Site").

Your September 9 Letter asked Nasco to "make an initial contact with the Office of Zoning Administration to coordinate the filing of the Plan Approval application for purposes of a review of compliance with the conditions imposed under ZA 16926 and 16926(PAD)".  Although Nasco is responding within that 30-day time frame, as requested, Nasco does not believe that there is any legitimate factual or legal basis for a Plan Approval application and that any such requirement would be an arbitrary and capricious action by the City because, among other things, the September 9 Letter is based on a number of inaccurate and unfounded factual and legal assertions and assumptions. Accordingly, Nasco thought it important to first try to ensure that the Office of Zoning Administration had the correct facts and a complete understating of Nasco's operations at the Nasco Site before the City took any action which might violate or infringe upon Nasco's vested rights in ZA 16926 and 16926(PAD) and the Nasco Site.

In that respect, most, if not all, of the assertions and claims set forth in the September 9 Letter appeared to have been taken wholesale from the March 8, 2022 letter from Councilmember Kevin de Leon to your office ("De Leon Letter") without any effort to confirm the accuracy of any of the unfounded accusations contained in that letter. Nasco did not receive the De Leon Letter until many months later, but responded in detail by its own letter dated July 28, 2022. A copy of Nasco's July 28, 2022 letter was sent to your office which confirmed its receipt.

Letter to Estineh Malian, Chief Zoning Administrator
October 7, 2022
Page 2

No effort has been made to date by either Councilmember de Leon's office or your office to discuss the exaggerated claims made against Nasco or to confirm that any of the claims are actually true. Nor has Councilmember de Leon's office responded to Nasco's letter or followed up on Nasco's invitation to meet with him and his staff.

The fundamental premise for the September 9 Letter and your Office's request for a Plan Application is the assertion that the Nasco Site's operations "are in violation of LAMC Section 13.01-F.43 and potentially in violation of other standards enumerated under LAMC Section 13.01 - F.18," based on of unfounded and unproven accusations of regulatory "noncompliance" as set forth in Attachment "D" to the September 9 Letter. Again, no effort has been made by your office to give Nasco an opportunity to discuss or to refute any claims of regulatory noncompliance.

We question whether the Zoning Administrator actually has the legal authority to unilaterally change any of the conditions of Nasco's land use permits. Whatever authority the Zoning Administrator may have under Condition 23 of Case No. ZA 16926 to " impose additional corrective measures to the subject property's use", that authority cannot be legally exercised in an arbitrary and capricious manner based on unproven assumptions and accusations or without providing Nasco an opportunity to contest any such allegations in an impartial hearing consistent with its due process rights.

In that respect, both the September 9 Letter and the De Leon Letter make the fundamental mistake of confusing allegations made in agency inspection reports and notices of violation with final administrative and judicial determinations. The fact that an agency identifies an issue and sends out a notice of an alleged violation or that a complaint is made by an unidentified person does not mean that a regulatory violation actually occurred or has been proven.

Regrettably, the September 9 Letter fails to distinguish between facts and unsubstantiated accusations. For example, Attachment "D" to the September 9 Letter refers to two alleged notices of violations issued by CalGEM, one dated March 30, 2021, described as "15 violations, including but not limited to: (i) leaking vapors from wellhead, (ii) an equipment tank was leaking vapors, (iii) a portion of a pipeline was leaking vapors, (iv) substandard fencing/exterior wall requirements, (v) visible spills of hazardous materials near tanks"; and another, dated May 26, 2021, described as "(i) Unpermitted work on wells and (ii) failure to submit an oil pipeline management plan."

The first CalGEM item is dated March 30, 2021 and refers to 15 violations identified during an inspection. First, to our knowledge, no formal notice of violation was actually sent by the CalGEM District Deputy Supervisor with respect to the items listed in the March 30, 2021 Inspection Report. The report itself was a routine listing of items which the operator was asked to address. Each of the items listed in the inspection report was actually a relatively minor and mundane maintenance matter. For example, *10 of the 15* items listed in the March 30, 2021 inspection report were for vessel identification plates on certain equipment that were not legible. Nasco was directed to correct the plates. The legibility of an identification plate on a tank hardly poses a threat to health, safety or the environment. Another item related to an enclosure and the notice directed Nasco to propose an alternative enclosure.  The few other items noted were minor, non-recurring maintenance issues

Letter to Estineh Malian, Chief Zoning Administrator
October 7, 2022
Page 3

which Nasco promptly addressed and corrected. No further action was taken by CalGEM and , to our knowledge, each of the matters has been resolved.

As to the second CalGEM notice, we presume that you are referring to CalGEM's May 26, 2021 Order No. 1198 ("Order No. 1198").  Order No. 1198 did ***not*** involve "Unpermitted work on wells" as asserted in your letter, but, rather, was an attempt by CalGEM to reduce Nasco's MASP by nearly 25% without any scientific support or justification or appropriate supporting technical data to support such an action. Nasco filed an administrative appeal in which Nasco denied the truth of CalGEM's allegations in Order No. 1198. Order No. 1198 has been stayed by that appeal and California law allows operators to continue to operate while an appeal is pending. Nasco is confident that Order No. 1198 will not survive scrutiny when its appeal is heard by an administrative law judge. Furthermore, since Order No. 1198 was issued, CalGEM agreed to increase the MASP for the wells in question.

As to the reference to an alleged "failure to submit an oil pipeline management plan", CalGEM can confirm that Nasco submitted a pipeline management plan in November 2021 and updated that plan in January 2022- months before your September 9 Letter.  The other CALGEM items identified in Attachment "D" have been similarly addressed.

Your September 9 Letter also refers to "Odor Complaints" made to the South Coast Air Quality Management District and dated February 15, 2022. However, our review of SCAQMD's database from that time period did not locate any notice to comply or a notice of violation issued to Nasco. As we understand, SCAQMD inspectors visited the Nasco Site after a complaint was made of odors in the area, but did not identify any problems with Nasco's facilities. If you are aware of any notice of violation sent to Nasco, we would appreciate it if you could provide a copy to us.

Attachment "D" also refers to a September 3, 2019 notice from the Los Angeles County Fire Department with respect to obtaining a USEPA identification number for hazardous waste handling. However, Nasco promptly applied for the identification number and, as we understand, the matter was listed as having been resolved as of January 27, 2020.  The other items listed Attachment "D" were reporting matters and not instances of any releases to the environment.

Nasco's Drill Site is located in Oil Drilling District U-91 which was established by Ordinance No. 124,316 in 1963 and oil and gas production operations have occurred at this site and in this area for the last 60 years. Nasco conducts all of its operations in an environmentally sensitive manner, consistent with applicable environmental laws, rules and regulations.

None of the issues raised by CalGEM or any other regulatory agencies since 2018 which are identified in Attachment D to the September 9 letter concern any actual threats to the structural integrity of Nasco's wells or its facilities or the environment. Instead, they dealt with routine reporting and maintenance issues and testing delays that were largely attributable to Nasco's internal turnover and/or the COVID-19 pandemic. Unsubstantiated and untrue accusations, such as statements made to the media about "methane leaks" by a Councilmember's staffer, are not a legitimate basis for trying to modify Nasco's vested right to operate its facility.

Letter to Estineh Malian, Chief Zoning Administrator
October 7, 2022
Page 4


Nasco thinks that the best way to address any concerns that the Zoning Administrator may have would be through dialogue with your office. Accordingly, we would appreciate the opportunity to meet with your office as well as Councilmember de Leon's office. We are confident that we can fully address any concerns that you may have without the necessity for any review of the conditions set forth in ZA 16926 and 16926(PAD).

Please do not hesitate to contact us if you have any questions regarding the foregoing. We look forward to hearing from you.


Very truly yours,

John J. Harris


cc:     Nasco Petroleum, LLC (via e-mail)
        Councilmember Kevin de Leon, Fourteenth District (via e-mail)
        Erica Blyther, Office of Petroleum and Natural Gas Administration and Safety (via e-mail)
        Captain Lawrence Salas, Los Angeles Fire Department - Oil Wells Unit (via e-mail)
        Royce Long, Los Angeles Fire Department - CUPA Unit (via e-mail)
        Catherine Nuezca-Gaba, Los Angeles Department of Building and Safety (via e-mail)
        Jennifer Tobkin, Office of the City Attorney (via e-mail)
        Uduak Ntuk-Joe, California Geologic Energy Management Division (via e-mail)
        Terrence Mann, South Coast Air Quality Management Division (via e-mail)
        Jeff Holwager, Los Angeles County Fire Department – HHMD (via e-mail)


JJH:ld

4861-5590-5591, v. 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

OFFICE OF ZONING ADMINISTRATION
200 N. SPRING STREET, ROOM 763
LOS ANGELES, CA 90012-4801
(213) 978-1318

**ESTINEH MAILIAN**
CHIEF ZONING ADMINISTRATOR

**ASSOCIATE ZONING ADMINISTRATORS**
JACK CHIANG
HENRY CHU
JONATHAN A. HERSHEY, AICP
THEODORE L. IRVING, AICP
CHARLES J. RAUSCH JR.
CHRISTINA TOY LEE

**CITY OF LOS ANGELES**
CALIFORNIA



ERIC GARCETTI
MAYOR

LOS ANGELES DEPARTMENT
OF CITY PLANNING
EXECUTIVE OFFICES

VINCENT P. BERTONI, AICP
DIRECTOR

SHANA M.M. BONSTIN
DEPUTY DIRECTOR

ARTHI L. VARMA, AICP
DEPUTY DIRECTOR

LISA M. WEBBER, AICP
DEPUTY DIRECTOR

planning.lacity.org

November 16, 2022

Nasco Petroleum, LLC (Op)
ATTN: Amit Yonay, Agent
1325 South Broadway
Los Angeles, CA 90015

John J. Harris (R)
Casso & Sparks, LLP
13300 Crossroads Parkway North
Suite 410
City of Industry, CA 91746

**CASE NO**. ZA 16926(PAD)
**LETTER OF COMMUNICATION**
155 West 14th Place, 1325 South
Broadway
Central City Community Plan Area
**ZONE:** C2-2D-O
**D.M. :** 124-5A207
**CD:** 14 – de León
**Legal Description:** Lots 6-10 of
Subdivision of Center Portion of
Carr Tract; Lots D, E and 29 of
Subdivision of North Portion of
Carr Tract; and Lot C of Tract
1491

The Department of City Planning's Office of Zoning Administration (OZA) is in receipt of your legal counsel's letter, signed by Mr. Harris on October 7, 2022, that indicates you have received and read our office's Letter of Communicated dated September 9, 2022.

In response, the OZA sends this courtesy reminder that Nasco Petroleum LLC is required to file a Plan Approval application for a review of compliance with the conditions imposed under Case Nos. ZA 16926 and ZA 16926(PAD) for the property located at 1325 South Broadway. The purpose of this Plan Approval is to review the operator's compliance with, and the effectiveness of, the Conditions of Approval, based on the recent, documented record of potential non-compliance at the drill site.

On September 9, 2022, the Office of Zoning Administration, in accordance with Conditions of Approval contained in Case Nos. ZA 16926 and ZA 16926(PAD), and Section 12.27.1-B of the Los Angeles Municipal Code, required the filing of a Plan Approval (Compliance Review) for the subject property's use. This specific use has discretionary and conditional land use approval from the Office of Zoning Administration as highlighted in the Conditions of Approval for Case Nos. ZA 16926 and ZA 16926(PAD). Condition No. 23 of Case No. ZA 16926 clearly outlines the authority

CASE NO. ZA-16926(PAD)

for the Zoning Administrator to evaluate and impose corrective measures on the subject property's land use, if necessary. Through the filing of a Plan Approval (Compliance Review), the applicant shall submit evidence to substantiate compliance with the conditions of approval, as well as submit documentation for consideration regarding the potential concerns of non-compliance as outlined in the September 9, 2022 Letter of Communication. Upon filing the Plan Approval application, the matter shall be set for a public hearing and the ZA review will provide the operator an opportunity to present their compliance narrative, and subsequently issue a determination on the compliance status for the drill site.

**FAILURE TO FILE THE PLAN APPROVAL (COMPLIANCE REVIEW) APPLICATION BY DECEMBER 5, 2022 MAY RESULT IN A DELINQUENCY STATUS FOR YOUR LAND USE OPERATION.**

This is the only courtesy reminder notice you will receive to file the application. The Plan Approval filing application fees for a Compliance Review would be a total of $17, 696.15 per LAMC Section 19.01-E ("Modification or Review by ZA"). The application materials, as required by the Office of Zoning Administration, must be filed by December 5, 2022 at the Metro Development Services Center in Downtown Los Angeles.

Your party's failure to file the application will result in the City filing the application on your behalf. The application filing fee for this City-initiated process would amount to $74,873.93 per LAMC Section 19.01-N ("Imposition of Conditions"). Payment of all fees required per the Municipal Code (Section 19.01) and all administrative costs of the processing are the responsibility of the property owner and/or the operator.

The required application materials must be filed on the prescribed forms, along with the appropriate filing fee, with the Department of City Planning at any of the Downtown (Figueroa Plaza) Development Services Center located at 201 N. Figueroa Street, 4th Floor, Los Angeles, CA 90012.

Please direct initial contact to Edber Macedo, City Planner, Office of Zoning Administration, at (213) 978-1198 or e-mail at: edber.macedo@lacity.org to discuss the next steps on filing the Plan Approval (Compliance Review) as required herein.

ESTINEH MAILIAN
Chief Zoning Administrator


EM:VS:ecm

cc:   Councilmember Kevin de León, Fourteenth District
      Eric Blyther, Office of Petroleum and Natural Gas Administration and Safety
      Captain Lawrence Salas, Los Angeles Fire Department – Oil Wells Unit
      Royce Long, Los Angeles Fire Department – CUPA Unit
      Catherine Nuezca-Gaba, Los Angeles Department of Building and Safety
      Jennifer Tobkin, Office of the City Attorney

CASE NO. ZA-16926(PAD)

Uduak Ntuk-Joe, California Geologic Energy Management Division
Terrence Mann, South Coast Air Quality Management Division
Jeff Holwager, Los Angeles County Fire Department -- HHMD

Attachment A:
9/9/2022 -- Letter of Communication from the Chief Zoning Administrator to Broadway
Drill Site management

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT J

John J. Harris
jharris@cassosparks.com
www.cassosparks.com



**Casso&Sparks, LLP**

ATTORNEYS AT LAW
13300 Crossroads Parkway North, Suite 410
City of Industry, CA 91746
Telephone: 626.269.2980

**VIA EMAIL AND U.S. MAIL**

December 5, 2022

Estineh Malian, Chief Zoning Administrator
Edber Macedo, City Planner
City of Los Angeles
Office of Zoning Administration
200 N. Spring Street
Room 763
Los Angeles, CA 90012-4801

Re: <u>Case No. ZA 16926(PAD) -Letter of Communication to Nasco Petroleum, LLC-155 West 14th Place, 1325 South Broadway, Los Angeles, CA</u>

Dear Ms. Malian and Mr. Macedo:

Nasco Petroleum, LLC has asked our firm to respond to your most recent "Letter Of Communication" dated November 16, 2022 ("November 16 Letter") regarding Nasco's oil and gas production facility located at 155 West 14th Place and 1325 South Broadway in Downtown Los Angeles (the "Broadway Site"). We did not receive your letter until November 21, 2022.

Your November 16 letter acknowledges receipt by the City's Planning's Office of Zoning Administration ("OZA") of our October 7, 2022 letter which responded in detail to each of the factual and legal misstatements set forth in OZA's prior letter dated September 9, 2022 ("September 9 Letter"). (I have enclosed a copy of our October 7, 2022 letter for your reference.) After addressing the many unsubstantiated and untrue accusations set forth in the September 9 Letter, we offered on behalf of Nasco in our October 7, 2022 letter to address any legitimate concerns that the Zoning Administrator or Councilmember de Leon's office might have at a meeting. Neither OZA nor Councilmember de Leon's office responded to Nasco's proposal or any other matters discussed in our October 7 letter.

Under these circumstances, we were surprised and disappointed to receive your November 16 Letter which asserted without any basis in fact or law that Nasco "… is required to file a Plan Approval application for a review of compliance with the conditions imposed under Case Nos. ZA 16926 and ZA 16926(PAD) for the property located at 1325 South Broadway." Your November 16 Letter further asserts that: "The purpose of this Plan Approval is to review the operator's compliance with, and the effectiveness of, the Conditions of Approval, based on the recent, documented record of potential non-compliance at the drill site." Since your November 16 Letter fails to respond in any respect to any of the factual or legal points raised in our October 7, 2022 letter, and no effort was

Letter to Estineh Malian, Chief Zoning Administrator
December 5, 2022
Page 2

made to contact us or Nasco to schedule a meeting to discuss Nasco's operations at the Broadway Site, we can only conclude that OZA has no evidence or legal arguments to refute Nasco's position set forth in our October 7, 2022 letter regarding its compliance with the conditions set forth in ZA 16926 and 16926(PAD). Accordingly, OZA's claim of "recent, documented record of potential non-compliance at the drill site" is patently untrue.

In that respect, we sent requests under the Public Records Act in 2021 to both OZA and Council Member De Leon's office requesting, among other things, documents that might support any contention regarding Nasco's compliance with the conditions of its conditional use permit. Despite the many reckless accusations set forth in Council Member De Leon's March 8, 2022 Letter (which Nasco refuted in detail in its July 28, 2022 reply), his office produced no documents whatsoever to substantiate his claims. Similarly, the minimal documents produced by OZA in response to our separate PRA request also failed to support any of the claims set forth in OZA's September 9 Letter.

Your November 16 Letter once again demands that Nasco immediately "… submit a 'Plan Approval (Compliance Review)' and pay $17, 696.15 per LAMC Section 19.01-E ("Modification or Review by ZA") and threatens Nasco that, if it does not comply with OZA's demand, the City would file an application itself and try to charge Nasco $74,873.93.

An assertion that Zoning Administrator has the authority under Condition 23 of Case No. ZA 16926 to require a "Compliance Review" and  to try to extort payment from Nasco for that review appears to be based on a fundamental misapprehension or misapplication of the applicable provisions of Nasco's CUP and the Municipal Code.

First, Condition 23 provides:

> "That the Chief Zoning Administrator reserves the right to impose additional conditions or require corrective measures to be taken *if he finds after actual observation or experience with drilling one or more of the wells on the subject property that additional conditions* are necessary to afford greater protection to adjacent or surrounding property as intended by the provisions of Section 13.01 of the Municipal Code, as well as the conditions set forth in Ordinance No. 124316." (Emphasis added.)

We question the applicability of Condition 23 in this instance. None of the matters identified in OZA's September 9 Letter are based on the Chief Zoning Administrator's  "actual observation or experience with *drilling one or more of the well*s on the subject property" since no drilling operations are occurring on the property and, in fact, all drilling activities on the Broadway Site were completed decades ago.

Even assuming for the sake of argument that any plausible factual and legal basis was present, the consideration of additional conditions cannot be taken by the Zoning Administrator unilaterally without a hearing followed by findings of fact. No such hearing has taken place. The authority cited in OZA's September 6 Letter for requiring a compliance review, Section 12.27.1 of the Municipal Code, sets forth the process and procedure for "*Administrative Nuisance Abatement* Proceedings". Section 12.27.1.C.1 requires a noticed hearing and written decision "…supported by written

Letter to Estineh Malian, Chief Zoning Administrator
December 5, 2022
Page 3

findings, including a finding that the Director's determination does not impair the constitutional rights of any person." Necessarily, no such nuisance abatement proceedings under Section 12.27.1 have occurred nor has the Director made any written findings after a hearing and consideration of any evidence.

Furthermore, as set forth in detail in our October 7 Letter, as well as Nasco's July 28, 2022 letter to Councilmember De Leon, the Zoning Administrator would have no factual or legal basis to support any review or modification of Nasco's CUP or to otherwise infringe on Nasco's vested rights to operate its Broadway Drillsite.

There is simply no legal basis for requiring Nasco to initiate the "Compliance Review" Process. The provisions of the Municipal Code relating to "Compliance Review" are set forth in Section 12.27.1.C.3 which states:

> "3.   Compliance Review. ***Upon any finding of nuisance or non-compliance with existing conditions imposed on the land use or discretionary zoning approval,*** the Director's determination shall impose a condition requiring the business operator or property owner to file a Plan Approval application for Review of Compliance with Conditions within two years of the effective date. At the discretion of the Director, the due date for the Plan Approval application can be set for 90 days, 180 days, one year, 18 months or two years from the effective date of the Director's determination or the Council action on appeal." (Emphasis added.)

Any Compliance Review requirement cannot be imposed until and unless nuisance abatement proceedings have been conducted and completed in accordance with Section 12.27.1. There would be no valid evidentiary basis to support "any finding of nuisance or non-compliance with existing conditions". ***Therefore, the Zoning Administrator does not have the legal authority to demand that Nasco submit an application for Compliance Review now.***

The fact that OZA is continuing to pursue this matter at the insistence of Councilmember De Leon and without any evidence or legal support for the claims, solely for the purpose of harassing Nasco, raises basic questions of due process and actual bias which ultimately taint OZA's actions and demands.

Similarly, we do not believe that either Section 12.27.1 or Section 19.01 can be properly construed to allow the City to force Nasco to pay the costs for an investigation of baseless accusations against it without a hearing first. Nasco has *not* made any application for a review of its conditional use permit. In any event, Art. XIII C, § 2 would prohibit any such charge by the City. Your letter also cites no authority for the claim that the City can arbitrarily file an application on Nasco's behalf and then charge it $74,843.93 as asserted in the November 16 Letter. Accordingly, there is no factual or legal basis for any assertion that Nasco is required to either "file a Plan Approval (Compliance Review)" and or to pay a filing fee of $17, 696.15 or any other amount.

***Based on the foregoing, please confirm in writing within ten (10) days of the date of this letter that the Zoning Administrator formally rescinds and withdraws its demand that Nasco***

Letter to Estineh Malian, Chief Zoning Administrator
December 5, 2022
Page 4

submit a *"Plan Approval (Compliance Review)"* and pay $17, 696.15 (or any other amount)
associated with the demands set forth in OZA's September 9 Letter and its November 16
Letter.

*If the Zoning Administrator fails to timely confirm its withdrawal of its demand, Nasco may
be compelled to institute legal proceedings to enjoin the Zoning Administrator's patently
unlawful actions and to otherwise protect its legal and constitutional rights.*

Despite the lack of any response to Nasco's previous offers to meet, Nasco still believes that the
best way to address any legitimate concerns of the Zoning Administrator would be through
dialogue with OZA. Nasco remains confident that it can fully address any such concerns without the
necessity for any legal proceedings or any other review of the conditions set forth in ZA 16926 and
16926(PAD).

Please do not hesitate to contact us if you have any questions regarding the foregoing. We look
forward to hearing from you.

Very truly yours,

John J. Harris

Enclosure

cc:     Nasco Petroleum, LLC (via e-mail)
        Councilmember Kevin de Leon, Fourteenth District (via e-mail)
        Erica Blyther, Office of Petroleum and Natural Gas Administration and Safety (via e-mail)
        Captain Lawrence Salas, Los Angeles Fire Department - Oil Wells Unit (via e-mail)
        Royce Long, Los Angeles Fire Department - CUPA Unit (via e-mail)
        Catherine Nuezca-Gaba, Los Angeles Department of Building and Safety (via e-mail)
        Jennifer Tobkin, Office of the City Attorney (via e-mail)
        Uduak Ntuk-Joe, California Geologic Energy Management Division (via e-mail)
        Terrence Mann, South Coast Air Quality Management Division (via e-mail)
        Jeff Holwager, Los Angeles County Fire Department – HHMD (via e-mail)


JJH:ld

4884-5748-7681, v. 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT K

OFFICE OF ZONING ADMINISTRATION
200 N. SPRING STREET, ROOM 763
LOS ANGELES, CA 90012-4801
(213) 978-1318

**ESTINEH MAILIAN**
CHIEF ZONING ADMINISTRATOR

**ASSOCIATE ZONING ADMINISTRATORS**
JACK CHIANG
HENRY CHU
TIM FARGO
JONATHAN A. HERSHEY, AICP
PHYLLIS NATHANSON
CHARLES J. RAUSCH JR.
CHRISTINE SAPONARA
COURTNEY SHUM
CHRISTINA TOY LEE
JORDANN TURNER

**CITY OF LOS ANGELES**
CALIFORNIA



**KAREN BASS**
MAYOR

LOS ANGELES DEPARTMENT
OF CITY PLANNING
EXECUTIVE OFFICES

VINCENT P. BERTONI, AICP
DIRECTOR

SHANA M.M. BONSTIN
DEPUTY DIRECTOR

ARTHI L. VARMA, AICP
DEPUTY DIRECTOR

LISA M. WEBBER, AICP
DEPUTY DIRECTOR

planning.lacity.org

December 15, 2022

Nasco Petroleum, LLC (Op)
ATTN: Amit Yonay, Agent
1325 South Broadway
Los Angeles, CA 90015

John J. Harris (R)
Casso & Sparks, LLP
13300 Crossroads Parkway North
Suite 410
City of Industry, CA 91746

**CASE NO.** ZA 16926(PAD)
**LETTER OF COMMUNICATION**
155 West 14th Place, 1325 South
Broadway
Central City Community Plan Area
**ZONE:** C2-2D-O
**D.M.:** 124-5A207
**CD:** 14 – de León
**Legal Description:** Lots 6-10 of
Subdivision of Center Portion of Carr Tract;
Lots D, E and 29 of Subdivision of North
Portion of Carr Tract; and Lot C of Tract 1491

The Department of City Planning's Office of Zoning Administration (OZA) is in receipt of your legal counsel's letter dated December 5, 2022. This letter argues that the City does not have the authority to call Nasco Petroleum, LLC in for a review of conditions. Furthermore, it asks the City to confirm in writing within 10 days that it will rescind and withdraw the request for Nasco to submit a Plan Approval (Compliance Review).

The City does have the authority to call Nasco Petroleum, LLC in for a review of conditions. Due to the operator's failure to file the Plan Approval application in a timely manner (as requested on September 9, 2022 and November 16, 2022), and in order to address the drill site's operations which have generated numerous complaints, violations and enforcement actions from multiple regulatory agencies, the City will move forward with administrative nuisance abatement proceedings pursuant to Los Angeles Municipal Code (LAMC) Section 12.27.1. These provisions allow the City's zoning authorities to protect the public peace, health and safety from any land use which becomes a nuisance; adversely affects the health, peace or safety of persons residing or working in the surrounding area; or violates any land

Page 1 of 3

CASE NO. ZA 16926(PAD)

use related condition imposed pursuant to this chapter or other provision of law, while protecting the constitutional rights of the parties involved.

An Associate Zoning Administrator, on behalf of the Director of Planning, will conduct a hearing to obtain testimony from the property owner and/or business operator, and affected and/or interested persons regarding the drill site's operations which have generated numerous complaints, violations and enforcement actions from multiple regulatory agencies including the State of California's Geologic Energy Management Division (CalGEM), the South Coast Air Quality Management District, the Los Angeles Fire Department Certified Unified Program Agency, and the Los Angeles County Fire Department Health Hazardous Materials Division as outlined in the OZA's Letter of Communication dated September 9, 2022. The OZA will provide a written notice no less than 24 days prior to the public hearing with particulars about the hearing, including but not limited to: hearing date, time and virtual hearing information.

Pursuant to LAMC Section 12.27.1, the Associate Zoning Administrator will review the record for the operator's compliance with the Conditions of Approval and any other provision of law, as well as any other activities which may be a nuisance or adversely affect the surrounding environment.    After the public hearing,  the Associate Zoning Administrator will issue a written determination which may impose corrective conditions, as deemed appropriate and necessary.

If is determined that the operation of the land use has created a nuisance or that the property owner, business operator or person in control, is not in substantial compliance with the conditions of operation, the City shall impose a condition requiring payment of the fee set forth in Section 19.01 N (Imposition of Conditions -City Initiated) of this Code to cover the City's costs in processing the matter. Per LAMC Section 19.01-N, payment of all fees and all administrative costs of the processing of said case are the responsibility of the property owner and/or the operator. Therefore, you are hereby notified of potential applicable fees per LAMC Section 12.27.1 (and updates thereto), to the property owner and/or business operator to be paid within 30 days of the effective date of the determination letter.

Should you have further questions please contact Edber Macedo, City Planner, Office of Zoning Administration, at (213) 978-1198 or e-mail at: edber.macedo@lacity.org.

ESTINEH MAILIAN

Chief Zoning Administrator

EM:VS:ECM

CASE NO. ZA 16926(PAD)

cc:     Councilmember Kevin de León, Fourteenth District

        Eric Blyther, Office of Petroleum and Natural Gas Administration and Safety

        Captain Lawrence Salas, Los Angeles Fire Department – Oil Wells Unit

        Royce Long, Los Angeles Fire Department – CUPA Unit

        Catherine Nuezca-Gaba, Los Angeles Department of Building and Safety

        Jennifer Tobkin, Office of the City Attorney

        Uduak Ntuk-Joe, California Geologic Energy Management Division

        Terrence Mann, South Coast Air Quality Management Division

Jeff Holwager, Los Angeles County Fire Department – HHMD


ATTACHMENTS:

        Attachment A:  Letter of Communication dated September 9, 2022

        Attachment B:  Letter of Communication dated November 16, 2022